IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| TIMOTHY RAYMOND CARTER, | ) | |
| Petitioner | ) | Civil Action No. 7:21cv00113 |
| | ) | |
| v. | ) | MEMORANDUM OPINION |
| | ) | |
| HAROLD CLARKE, | ) | By: Michael F. Urbanski |
| Respondent | ) | Chief United States District Judge |

Timothy Raymond Carter, a Virginia inmate represented by counsel, has filed a petition

for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, challenging his 2015 Lee County

Circuit Court convictions for second-degree murder and use of a firearm in the commission

of murder. Carter was accused and found guilty by a jury of murdering his wife, Amy.[1] The

respondent has filed a motion to dismiss, ECF No. 7, and this matter is now ripe for decision.

After thoroughly reviewing the full record, the court **GRANTS in part** and **DENIES in part**

the motion to dismiss. The court **GRANTS** the motion to dismiss with respect to Claims One

and Two and **DENIES** the motion to dismiss with respect to Claim Three. The petition is

**GRANTED** as to Claim Three, subject to the Commonwealth of Virginia's decision to retry

Carter within 120 days.

I.

## A. Factual Background

More than thirty witnesses testified during twelve days of trial. For clarity, the following

facts are summarized primarily by topic and chronology rather than witness by witness.

---

[1] Defendant Timothy Carter is referred to as "Carter" and decedent Amy Carter is referred to as "Amy."

### 1. The Death Scene

On April 14, 2011, officers from the Lee County Sheriff's Office and an ambulance were dispatched to an apparent suicide at the Carter home in Jonesville, Virginia, immediately after the emergency dispatcher received a telephone call from Reba Carter (petitioner's mother) at 5:21 p.m. Trial Tr. vol. 3, 45–52. The first officer to arrive on scene found Carter and his parents outside the home; Carter's mother told him Amy's body was in the master bathroom seated on the toilet. Two officers and emergency personnel confirmed that Amy had no pulse. The first officer remained at the scene until the body was taken to the hospital; nothing he saw made him question the characterization of the scene as a suicide. Id. at 239–56. Investigators took photographs of the scene, collected evidence from Amy's hands for the gunshot residue (GSR) kit and wrapped her hands in plastic bags. They secured and seized a .357 revolver after removing and separately securing the remaining ammunition and the fired cartridges from the gun.

Amy's body was seated on the toilet lid, fully clothed in a white tee shirt and pajama bottoms. Her left arm hung down to the side, next to the wall. Her right elbow was on the toilet tank and her forearm draped down the front of her shirt. A revolver with an eight-inch barrel was in her right hand, at rest on her abdomen. Her index finger was on the trigger, and the gun was at an odd angle, pointing up towards her head. A large deposit of black soot/gunpowder was on the chest of her shirt, and a large hole was in her neck. The floor was covered in blood. Two towels were on the floor, one over the HVAC vent under the sink and the other in the doorway, preventing the blood from leaving the bathroom. Blood spatter was visible all over the wall to the left and back of the toilet. Id. at 82–84, 86–87, 93–94, 96, 98,

2

207; Trial Tr. vol 6, 206–07; Commonwealth Ex. 28. When the investigators cleared them to remove the body, emergency personnel transported the body to the hospital for the official pronouncement of death. A doctor pronounced Amy dead at 8:15 p.m. Rigor mortis had not yet set in. Trial Tr. vol. 9, 182–87.

In addition to examining and photographing Amy and the biological evidence immediately surrounding her, the law enforcement officers photographed other items. Immediately to the left of the toilet was the bathroom wall, and to the right was the lavatory and vanity. The top drawer of the vanity was partially open, and an empty pill bottle was in the bathroom trashcan. Another pill bottle was on the counter, along with a piece of shoelace that looked like a "tie-off" used by drug abusers. Nine more pill bottles were on the dresser in the master bedroom. Trial Tr. vol. 3, 85–86, 88–90.

### 2. Before the Death

#### a. Uncontested Facts

Amy had a longstanding addiction to Xanax and Oxycodone. She had gone to a drug rehabilitation program in 2009 following a charge for driving under the influence of drugs (DUID), but her drug use continued. Approximately three months before her death, Carter learned that Amy had forged checks to herself on his business account, diverting between $60,000 and $80,000 from the account, presumably to support her drug habit. Carter closed that business account and opened a new one which Amy could not access.

Amy had multiple car accidents, likely related to her drug use. She had appealed a 2010 DUID conviction from general district court, and the appeal was scheduled for court the week after her death. On Monday, April 11, 2011, three days before her death, she and Carter picked

3

up her BMW from the repair shop. On Wednesday night, April 13, 2011, Amy totaled the BMW in a single car accident, for which she was cited for reckless driving. The investigating state trooper suspected drug impairment, but Amy had received morphine from the hospital before the officer could request a drug screen. Trial Tr. vol. 2, 187–203. Amy was transported by ambulance to the hospital for complaints of pain in her right arm and wrist. Trial Tr. vol. 3, 32–44. X-rays revealed no fracture, but she had tenderness and swelling on the thumb side of her right forearm, between the wrist and the elbow, consistent with bruising. Trial Tr. vol. 5, 167–83. Following treatment, Amy was released from the emergency room between 1:00 and 2:00 a.m. on the morning of April 14, 2011, the day of her death.

### b. Prosecution Evidence

According to Amy's twin sister Amanda Garrett, Amy and Carter had a volatile relationship. It was Amy's third marriage. When Amanda was around them, they were always fighting. Amy left Carter for about six months in 2008 or 2009 and stayed with Amanda and her boyfriend Steve. At first, Amy brought their son, Dalton, but after a couple of weeks, Carter picked Dalton up and took him home. While Amy lived with her, Amanda noticed that Amy's drug use was worsening. She said that Amy went back to the marriage so she could be with her son, but the marriage remained troubled. She testified that Amy and Carter both abused Xanax and Oxycodone during the two years before Amy's death, and they fought a lot when both were under the influence of drugs. Trial Tr. vol. 2, 79–89, 135–38.

The last time Amanda saw Amy, Amanda drove Amy and Carter to Kingsport, Tennessee, to pick up Amy's BMW from the repair shop on the afternoon of Monday, April 11, 2011. The car looked perfect. She remembered Carter saying, "It better stay looking like

4

that, or else." Id. at 92. She thought he was joking at the time, but was not totally sure because Amy had wrecked her car several times. Id. at 89–93.

Despite Amy's drug addiction and marital problems, Amanda insisted that Amy was a happy person, not depressed. She claimed that she and Amy were very close, and Amy would never have considered suicide. On cross examination, Amanda admitted that she did not know Amy was seeing or had seen a psychiatrist, she did not know how many times Amy had been an inpatient for rehabilitation, and she did not know that Amy told her doctor that she had been suicidal in the past. Id. at 115–30.

Jessica Crabtree, Amy's first cousin, testified that she spoke with Amy on the telephone the morning of her death around 9:00 or 10:00 a.m. She said that Amy was upset and crying, and she heard Carter in the background yelling, "if she had another accident that it would be the last time that she drove a damn car." Trial Tr. vol. 4, 11. Three days later, the prosecution recalled Crabtree to say that she had reviewed her phone records and made a mistake about the date of her phone call with Amy. The phone call was three days earlier, on Monday. Trial Tr. vol. 7, 6–12. The prosecution had all the phone records from both Amy and Carter's cell phones, and the only call between Jessica and Amy was an 18-minute call on April 11, 2011.

Carter's neighbor, Chrissy Alford, got a phone call from Amy on April 13 after she had gone to bed. Amy wanted a ride home from the hospital, but Chrissy declined. Shortly after, Chrissy's husband, Scott, went to help Carter with a disabled car.

Scott Alford testified that he saw Carter after midnight on April 13, 2011. Carter's truck had run out of gas halfway between Carter's home and Alford's home. From its location, the truck could be moved downhill to the Alford home more easily than it could be moved to

Carter's home. Alford helped Carter get the pickup to Alford's driveway and then took Carter home. While Alford was driving, Carter was on the phone with someone, and Carter was aggravated. Alford said Carter could have been on the phone with Amy, but he did not know for sure. Alford could not recall exactly what Carter said during the conversation. Trial Tr. vol. 7, 155–59. Over defense objection, the trial court allowed the Commonwealth to treat Alford as a hostile witness.

Considerable argument outside the presence of the jury focused on what questions the Commonwealth could ask Alford about prior statements to police. The court ruled that questions regarding specific statements Alford made could be asked, but not questions about statements that were clearly speculative when made. Id. at 160–87. After the jurors returned, the Commonwealth asked Alford if he had told Detective Rouse that Carter was cursing her [Amy] on the phone; Alford acknowledged that Carter was cursing on the phone, but he did not believe he said that Carter was cursing Amy. The Commonwealth asked if Alford had said that Carter said, "there's no more Mercedes or BMW, whatever it is, you know, that f***ing car, you know, I'm not fixing it again." Id. at 190. Alford responded by saying that the car had just been wrecked that same night, and the Commonwealth, over defense objection, asked the witness why he was trying to protect Carter. Alford denied trying to protect Carter and said again he could not say for sure what was said, because it had been four years, but he thought it was a "safe bet" that Carter was upset about the car. The Commonwealth also asked Alford if he had said that Carter said on the phone, "you f***ed up this time, you dumb bitch, or whatever. It was dumb bitch every other word, I mean." Id. at 194. Alford reiterated that he could not recall exact words, but that Carter was angry.

6

The Commonwealth then asked the following question:

> Isn't it true that on lines 3 through 9 in speaking with Detective Rouse, you said, "I can't—well, frankly, it's been so long, I mean, I just get, I can't remember exactly what he said, but I mean—I mean, he was very concerned—they—it might have been—well, I ought to kill you, or it might have been I'll blow your brains out."?

Id. at 198:8–15. Defense counsel immediately objected to the speculative nature of what Alford supposedly told Rouse; the court sustained the objection and directed the jurors to disregard the question. Id. at 198. Finally, the Commonwealth asked Alford if he told Investigator Ellis that Carter said into the phone, "I've got 120 Xanaxes, and if that don't do it, I've got a .357." Id. at 206. Alford stated that he had no recollection of making the statement but did not deny that he had done so. Id. at 206–08.

On cross-examination, Alford stated that he had been interviewed by police about the Carters so many times over the previous two years that he had begun to feel harassed. Ellis had also indicated from the beginning that he believed the Alfords were involved in providing drugs to the Carters, but then Ellis assured Alford that they would not be prosecuted if they cooperated in the investigation. Id. at 208–12.

Over defense objection, the trial court allowed the Commonwealth to call witnesses to impeach Alford's testimony. Id. at 183–84. Investigator Rouse testified that he interviewed Alford in February 2013; Rouse admitted lying to Alford, telling him that the interview was not being recorded. Id. at 223–24. Rouse testified that Alford said, "Yeah, well, I remember something about, yeah, that's no more Mercedes or BMW, whatever it is, you know that f***ing car, you know, I am not fixing it again," referring to what he heard Carter say on the phone. Id. at 219. Rouse further testified that Alford said he heard Carter say, "You f***ed up

7

this time, you dumb bitch, or whatever. It was dumb bitch every other word, I mean." Id. at 221. The Commonwealth then recalled Ellis. Ellis testified that he was in traffic court in December 2014 or January 2015 when Scott Alford approached and asked to speak to him in the lobby. He said that Alford claimed to hear Carter say on the phone "I got 120 Xanaxes and if that don't do it, I've got a .357" while he drove Carter home the night of the accident. On cross examination, Ellis acknowledged that Alford never made this statement during any of his recorded statements to the police. Ellis also admitted that he never prepared a report about that conversation, but simply told the Commonwealth's Attorney about it. Finally, Ellis testified that the Alfords were under investigation for providing drugs to Amy Carter.

### c. Defense Evidence

The defense evidence focused on two themes before Amy's death: (1) Amy's history of depression and prior suicidal ideation and gestures, and (2) pressures in her life immediately before her death that increased the risk of suicide. Defense Exhibit 124 contained selected portions of Amy's medical records, documenting that Amy suffered post-partum depression after the birth of her son in 2002, which was treated with Zoloft. Ex. 124, at 4. From March 2004 through July 2007, Amy complained of depression, trouble sleeping, crying spells, and other symptoms and doctors tried a variety of medications, including Zoloft, Effexor and Prozac. Id. at 10–11, 19. In May 2007, she again complained that the medications were not working and acknowledged having suicidal thoughts; her medication was switched from Prozac to Lexapro, and she was referred for psychiatric consultation. Id. at 23–24. By June 2007, her diagnoses included both depression and panic attacks, and the doctor increased the dose of Lexapro and added Xanax.

8

Meanwhile, in July 2003, Amy complained to her doctor about back pain, indicating that she had been diagnosed with a herniated disc about ten years earlier. Because her back had been hurting again recently, she had taken some of her husband's Lortab, which helped some. The doctor gave her an anti-inflammatory and a non-refillable prescription for thirty Lortab pills and sent her for x-rays. Id. at 8. In 2004, an MRI revealed a bulging disc. The doctor tried her on a variety of nonsteroidal anti-inflammatory medications, including Naprosyn and Lodine, but she continued to complain of pain. In May 2007, the doctor prescribed Lortab three times per day and had her sign a pain medication contract. Id. at 9–10, 22, 25–26.

In late September 2007, Amy went to the doctor complaining of a twice-sprained ankle for which she was prescribed Lortab. Id. at 31–33. In October 2007, imaging revealed a lesion or injury to the talus, a large bone in the ankle joint. She was given an air cast and told to use crutches and remain non-weight-bearing for six weeks. Id. at 34–35.

In early November 2007, Amy returned to her pain management/family doctor. She had separated from her husband and complained of injuries he allegedly inflicted by hitting her with his truck. She pointed to two superficial scrapes on her knees and a small bruise on her left thigh, which did not appear consistent with being hit by a truck or with her severe complaints of pain. Further, she was not using the crutches as directed by the orthopedic doctor. She said that she could not get to her crutches, because her husband had a protective order keeping her away from the house; likewise, she claimed she could not get to her medications, and she needed replacements for her Lortab and Xanax. The doctor requested a urine sample before he would consider replacement prescriptions, in part because of a note in

the file that a family member had called, concerned about Amy's abuse of Xanax. He offered to prescribe Ultram and Vistaril for pain and anxiety, respectively, but she declined those. When told that he would not issue a replacement prescription until he could view the results of a urine test, Amy left the office without taking a drug test. He followed up with a letter that he could no longer prescribe the Lortab and Xanax for her because she breached the medication management contract by leaving without giving the requested urine sample. Id. at 36–37.

Amy started with a new doctor in March 2008, complaining of anxiety and back pain. After three visits, that doctor would not prescribe the medications Amy wanted. The doctor offered to refer her to a psychiatrist, but Amy declined. Id. at 38–40. In early September 2008, Amy found her way to Dr. Moore. On her first visit with him, Dr. Moore prescribed Prozac and Xanax for her depression and anxiety. She saw Dr. Moore every three months, and he renewed her prescriptions. By March 2010, Lortab was also being prescribed for her. Her last visit with him was March 17, 2011, less than a month before her death, and he refilled her Prozac, Xanax, and Lortab prescriptions. Id. at 41–52.

In addition to the medical records reflecting ongoing problems with depression and panic attacks, and one mention of suicidal ideation, two witnesses testified about suicidal gestures Amy made. Patrick Burchett, a friend of Carter's since childhood, testified that he was watching television at the Carter home during the winter before Amy's death and heard Amy and Carter arguing in the bedroom. The argument escalated, and when they moved from the bedroom to the hallway, behind the chair in which Burchett was seated, he heard Amy say, "I'm just going to end it." He turned around in his chair and saw her with the .357 revolver

pointed towards herself, and he noticed the hammer was cocked. Carter got the gun out of her hand and passed it to Burchett. Burchett testified that he did not hear what Carter and Amy were saying after that because he was trying to uncock the gun without causing it to fire. He unloaded the gun, put the bullets in his pocket, and left. That was the only time he saw Carter touch that gun; he had seen the .357 before, with Amy, and she called it her gun. He knew there were no other guns in the house because he had helped Carter move all Carter's guns to his parents' house in November, because Carter was not allowed to have guns in the house while he was on probation. Trial Tr. vol. 8, 209–252.

Carter's mother, Reba Carter, also testified that she got a strange call from Amy, about three months before Amy's death, in which Amy said, "I started to kill myself. I had the gun up to my head and Tim grabbed it." Trial Tr. vol. 9, 54. Reba reminded Amy that she had a child to raise who needed both parents. Amy sounded tired and was having trouble talking, slurring her words. Id. at 53–55.

Carter's son Dalton, age twelve at the time of trial, testified that the family had only one laptop computer, and his mother used it, because his father was not good with computers. When Amy was not using the computer, she kept it under the bed, plugged in to charge. Amy also had a revolver with a wooden stock, which she kept hidden in the spare bedroom closet on the right side of the top shelf under a blanket. Dalton identified the .357 as his mother's gun. Amy told Dalton that if he told his dad where the gun was, she would kill herself. Carter had removed the other guns from his house because he could not have them. Dalton remembered seeing his father open the safe and write down the serial numbers before wrapping them in towels and taking them to the grandparents' home. Trial Tr. vol. 10, 38–43.

11

Honey Lytle, who had been Amy's hairdresser for eight or nine years before Amy's death, testified that Amy called her at the hair salon less than a week before her death, crying hysterically, and saying that no one cared about her. Amy was upset because she found out that her mother and her sister had been talking about Amy's drug problem in the salon. The call made Lytle uncomfortable, and she got off the phone as quickly as she could. Part of the discomfort was that everyone in the salon already knew Amy had a problem because she came into the salon impaired several times. Trial Tr. vol. 9, 10–20.

Through cross-examination of Chrissy Alford, the Commonwealth's witness, the defense elicited testimony that the day before her death and prior to the car accident, Amy told Chrissy that she was depressed and shared that she had been raped by an acquaintance. Amy began crying hysterically when she talked about the rape. In the year and a half that she had known Amy, it was the only time Amy had said anything about being depressed. Trial Tr. vol. 7, 128–45.

Burchett testified that he and Amy had grown close during the year before her death, in large part because they both used drugs. A year after her death, he went into rehab and had been clean for two years at the time of the trial. He recalled Amy telling him within three months of her death that her sister's boyfriend had recently sexually assaulted her, and she did not know how to deal with the situation. She said she needed to talk to someone, but she was afraid that telling Carter or the police would make the situation worse. Trial Tr. vol. 8, 216–20.

After the car wreck, the person who picked Amy up from the hospital and took her home after she called him around 1:00 a.m. was John Collier, retired superintendent of Lee

12

County Public Schools. Married to Carter's sister Patti, Collier had known Carter for thirty-eight years. Amy removed the sling and bandage from her arm as soon as she was in the car. While he was driving Amy home, she said two things that Collier found unusual: First, she said that she wished they had been smart like he and Patti were and had just gotten a dog instead of having a child. Then, she said if anything ever happened to her and Carter, she wanted Collier and Patti to raise Dalton, not her mother or sister. Trial Tr. vol. 9, 95–110.

Virginia State Trooper Bill Adkins testified that he cited Amy for DUID on June 4, 2010, after he saw her weaving for 100 yards on Route 58. She admitted to taking Xanax and was unable to perform the field sobriety tests. She was convicted in General District Court, receiving a $350 fine, ten days jail time suspended for one year of good behavior, license suspended for one year, and an order to attend the Virginia Alcohol Safety Action Program. She appealed the conviction but died the week before the case would have been heard in Circuit Court. Despite her drug impairment, the trooper testified that he saw nothing that would have impaired her ability to pull a trigger while so intoxicated. Trial Tr. vol. 8, 189–208.

The defense called Michael Carrico, an attorney who represented Carter in 2007 and 2008. Carter and Amy had separated on October 23, 2007, and Carrico filed a suit for divorce on Carter's behalf on November 15, 2007. On February 20, 2008, the parties executed a property settlement/separation agreement. The parties were to have joint legal custody of Dalton, with primary physical custody to Carter. No child support or alimony would be paid. They had no joint realty. Each would keep their own personal property. They waived all rights to each other's retirement accounts and bank accounts, and Amy waived all rights to Carter's business. Amy would keep her Toyota 4Runner, and Carter agreed to make all payments on

13

it. The agreement contained a reconciliation clause, that if they resumed their marital relationship, the agreement would remain in full force and effect unless rescinded in writing. Carter did not follow through with the divorce, and the court dismissed the case in April 2010 for no activity in over two years. To Carrico's knowledge, the agreement had never been rescinded. Trial Tr. vol. 10, 11–33.

Mandy Creech had been the bookkeeper at Carter's business until ten months before the trial. Two or three months before Amy's death, she told Carter that Amy had been signing his name on business checks and cashing them, causing the account to overdraw. Carter closed the account and opened a new one, keeping all checks for the new account locked in Mandy's office. Id. at 177–86.

### 3. After the Death

As previously noted, Reba Carter called the police to report Amy's death at 5:21 p.m. She testified that she had picked Dalton up from school when it let out at 3:30 p.m. Dalton wanted to see where his mother had wrecked the car, so they drove to the general area where it happened and walked around for about twenty minutes, and Dalton found a small piece of remaining wreckage. Then she headed home to feed Dalton dinner before his 5:00 p.m. baseball game. After Dalton finished eating and while he was changing into his uniform for the game, Carter came to the house. She noticed that his hand was bleeding and asked him what happened. He said something about a hammer, so she thought it happened at work. Then he said that Amy had shot herself and was dead. He was speaking low and seemed weak, tired, and in shock. She told him that she would call the police, take Dalton to the ballgame so he would not be at the house while police were there or see anything upsetting to him, and

14

then she would go to the house with Carter. She told Carter to sit in the chair and wait for her. She did not want to make Dalton late for the game and did not want him to hear her on the phone, so she took him to the ballgame before she called the police. When she got back home forty minutes later, her husband, Junior, was awake, and she told Carter and Junior to go down to Carter's house. She acknowledged that Carter did not put a bandage or anything on his hand, nor did he call the police during the forty minutes she was gone. Junior was hard of hearing and did not use the telephone. She called the police and then called her daughter Patti to tell her what had happened and asked her to pick Dalton up from the ballgame. Then, Reba went to Carter's house, joining Junior and Carter outside the house. No one went inside before the police arrived. Trial Tr. vol. 9, 21–35, 60–83.

Dalton stayed at Patti and John Collier's home that night and afterwards. Collier also took Carter to the hospital the night of Amy's death, after the police and EMS left the Carter home. The next morning, Collier helped Reba clean up the blood in the master bathroom. Carter did not go back to the house for several weeks, staying with the Colliers for six weeks when he got out of the hospital. Collier took Carter to work during those weeks because Carter was not driving. Carter seemed depressed during that time. Id. at 111–16.

Dalton testified that he remembered his father coming over to the grandparents' house on a red scooter and his hand was bleeding. He asked his father what happened, and his dad said he cut his hand while sharpening a lawnmower blade. He did not find out his mother was dead until the following Saturday, when Collier told him. Trial Tr. vol. 10, 43–48.

Yvonne Denney worked as a registered nurse at the Lee County Hospital emergency room when Carter arrived around 8:45 p.m. on the evening of April 14, 2011. She remembered

him because he seemed drunk, with slurred speech. He was crying and kept saying he tried to stop her but could not. He was not sweaty, but high blood sugar would not necessarily make him sweaty. She put stitches in the cut on his left hand. He also complained of pain in his right wrist. He was admitted to the hospital at 11:55 p.m. Trial Tr. vol. 7, 41–60. Roxie Hopkins, a lab tech at the hospital, testified that Carter had Xanax in his system when he arrived, but she did not know how much. Id. at 61–64.

Dr. Patrick Molony, Carter's regular physician, was called by the hospital and advised of Carter's admission on April 14, 2011. Trial Tr. vol. 7, 23. The ER notes indicated that Carter was dizzy and staggering with slurred speech and flat affect. He appeared intoxicated. However, he was found to be in diabetic ketoacidosis. Id. at 24–25. He complained of pain in his right hand and wrist. The Commonwealth had Dr. Molony read the following from the ER notes: "History is sketchy at the moment, but reportedly, the patient has a laceration and burn on the left hand and wrist, and the right hand. The patient said he thinks it was recoil of a—of the gun but he was unsure." Id. at 26. The Commonwealth also inquired about a prior admission in February 2011, in which Carter was noted to have abscesses on the backs of his hands; the doctor admitted that these could be consistent with illicit drug use.

On cross-examination, the doctor noted that he was not concerned about the level of Xanax in Carter's system on April 14, because it was consistent with the amount of the drug that he had prescribed for Carter. He also explained that ketoacidosis is a serious medical emergency in which the body's blood sugar levels rise due to lack of insulin, causing a patient to become dehydrated and acidotic. It upsets the balance of the whole body and can be fatal. Carter was admitted to the ICU and discharged from the hospital four days later. He returned

to the hospital on April 20 complaining of severe pain in his right hand, longer than a week, allegedly from cutting his hand on a lawnmower blade. Id. at 15–36.

Both Scott and Chrissy Alford testified that they drove to Carter's home on April 14, 2011, to see when Carter planned to pick up the truck that he left at the Alfords' the night before. Scott got out of the car and spoke to Carter and his father, who were in the driveway and told him that Amy was dead, and the police were on their way. While Scott was talking to them, Chrissy noticed that Carter's hand was bleeding. Scott got back in the car, and they left immediately. Chrissy said she noticed the clock on her car's dashboard, and it flashed 4:03 when Scott got back in the car. Trial Tr. vol. 7, 101–04, 147–49.

Amy's sister and cousin, Amanda Garrett and Jessica Crabtree, both testified that they went to the hospital to see Carter when they left the funeral home. Amanda asked how the accident happened, and Carter said they were struggling over the gun, and it went off. He also said that he had to "eat" the car, because Amy had not paid the insurance bill. Trial Tr. vol. 2, 98–99; Trial Tr. vol. 4, 4–10.

Mandy Creech, Carter's former bookkeeper, said that Carter asked her to file the insurance claim on the BMW two weeks after Amy's death, and after he was out of the hospital. Two weeks after she filed the claim, she received notice that the policy had previously been cancelled for non-payment. She told Carter the insurance policy had been cancelled and he seemed surprised. Trial Tr. vol. 10, 184–90.

### 4. The Law Enforcement Investigation

#### a. Carter's Statements

17

Carter spoke to Sergeant Combs, the first law enforcement officer to arrive at the scene. Carter said that Amy had locked herself in the bathroom with the gun, saying she was going to kill herself. He tried to pick the lock to get in but could not. Then Amy opened the door and let him in. She had the gun in her hand, cocked, under her chin and pointed at her head. He lunged for the gun to try to get it away from her or keep it from firing, but it went off. The hammer cut the webbing on his left hand. Combs' report said "suicide" because that was what dispatch said when sending him to the scene. Combs did not see anything on scene that made him think differently. Trial Tr. vol. 3, 247–48, 254–55.

The first recorded statement from Carter was also taken at the scene, by Investigator Ellis, just after one of the emergency responders dressed the cut on the webbing between the thumb and forefinger of Carter's left hand. Ellis noted that Carter's left hand also had black and red dots consistent with powder burn. Carter was right-handed. Ellis used an officer's body camera to record the brief statement. Trial Tr. vol. 4, 57–59, 65, 99, 115.

Carter said that he and Amy had been home the whole day, and they were the only people in the home at the time of Amy's death. They were lying on the bed watching their laptop computer to see the internet auction of a bulldozer that Carter was trying to sell on eBay. Amy got up to go to the bathroom, and Carter went to get something to drink. With no warning, Amy locked herself in the bathroom and announced that she was going to kill herself, which Carter said she had threatened many times before. He got something to try to open the bathroom door, and every time he could almost pull the door open, she jerked it shut again. He was able to get into the bathroom and he tried to pull the gun out from under her chin but

could not. He cut his left hand and he was not sure why, but his right hand hurt worse than his left.

Ellis discontinued the interview at that time because he said it was hard to understand what Carter was saying as Carter's speech was slurred, and he was sluggish and sleepy, as though he were intoxicated or under the influence of drugs. After the interview, Carter sat in his truck with his head laid back. Carter went to the hospital that evening for pain in his right wrist, and he was admitted to the ICU because he was in diabetic ketoacidosis.

Ellis next questioned Carter about a month later, on May 12, 2011, at the Sheriff's Office. Carter's description of the events remained the same, though he gave a few more details in response to specific questions. He described trying to take the gun from Amy's hands, saying that he slid his left hand down the barrel, trying to wedge his hand to prevent the hammer from firing the gun, and tried to pull the barrel away from her with his right hand, but the gun felt like it was stuck in concrete. Then the gun fired. The impact caused Carter to fall into the floor. Everything happened so fast, he was not exactly sure of the details.

When asked about the time, he said he did not know exactly. He thought the eBay auction went off at 1:00 p.m., and when he asked Amy to refresh the page, it said 1:17, which he took to mean one hour and seventeen minutes left to bid. Based on this, he guessed that she went into the bathroom just before noon. He said his right hand was hurting a lot the next morning, and he was not sure if that was from pulling so hard on the gun, from getting knocked into the floor, or from trying to break into the bathroom. He did not remember that he complained to Ellis of right-hand pain the night Amy died. He remembered seeing Amy's head go back and her arms jerk out. He thought the gun must have stayed in her left hand

because he thought he heard the gun rake down the wall as Amy's arm dropped, although he did not see the gun. Carter got off the floor and glanced at Amy before turning his head away because he could not stand to see her like that. He did not check her pulse, but he knew she was gone. Blood was filling up the bathroom floor very quickly.

Carter volunteered that before he ran out of the bathroom, he moved some spoons off the bathroom counter and put them in the cabinet under the sink. The spoons had black burn marks on the bottom. He did not want to disrespect Amy's memory by having anyone see the spoons out on the counter, and he knew that police would take pictures of the scene. Lee County did not have 911 service at the time, and he could not remember the emergency dispatch number, so he decided to ride his moped to his parents' home which was one mile away.

More than a year and a half passed before Ellis questioned Carter again, on January 11, 2013. This time, he gave Carter Miranda warnings[2] before the interview, and Carter signed a waiver. Ellis asked Carter what time the bulldozer auction was on the date of Amy's death, and Carter said Dalton had told him he was mistaken about the times. Carter thought the auction went off at 1:00. That was the best he could remember. He remembered seeing 1:17 on the screen when Amy refreshed the screen at his request, which he thought meant an hour and seventeen minutes to go. Carter said Amy was the one to work with the computer, because he did not know how to. Other than what he thought from what he saw on the computer, he

---

[2] In Miranda v. Arizona, 384 U.S. 436 (1966), the Supreme Court announced a rule requiring officers to advise suspects of their right to remain silent and right to have an attorney before conducting custodial interrogation.

did not know what time it was; there was no clock in the room, and he was not paying attention to the time.

Carter again described trying to get into the locked bathroom, finally succeeding when he used a nail or cuticle file. He was afraid to kick the door down, because the bathroom was small, and he feared kicking the door into her and causing the gun to go off. When he got inside, Amy was sitting on the commode lid, both hands on the gun, pointing the gun towards the top of her neck under the chin. He tried to get his left hand to block the hammer, to keep the hammer from hitting the firing pin, and he tried to take the gun from her hands with his right hand, but he was not successful. He ducked while pulling on the gun, because he was afraid it might shoot him if he pulled the barrel away from her. He assumes that the firing pin went right through the webbing of his hand, or the hammer pinched his hand, because he had a bad cut on the webbing after the gun went off. He remembers hitting the floor, being dazed, getting up. He heard what he thought was the gun scraping down the wall to the left of the toilet. He glanced at her for just a second and saw the gun was still in her hand. He could not remember the number to call the police, and he was afraid he could not give directions to the house because he was so upset, so he went to his parents' home. He said he went to their home, riding the moped, immediately after everything happened. It took him less than five minutes to get there. His mom said she would call the police, and he and his father went back to the house to wait for them. Police arrived about twenty minutes later.

Ellis asked Carter to explain the five-hour delay between the shooting and calling the police, and Carter said there was no five-hour delay, that he must have been wrong about the time; he thought the auction went off at 1:00, but it could have been 6:00 p.m. Ellis and State

Trooper Hughes asked if Carter went back into the house or altered the scene before the police arrived, and Carter adamantly denied going back into the house, and neither of his parents did either. He denied altering anything at the death scene. Later, specifically asked about the spoons, Carter admitted that he did move the spoons off the counter before he left the house, and he had forgotten about that.

Ellis questioned Carter about Amy's drug problem, about the money she had stolen from his business account by forging his signature, whether Amy had an extramarital relationship, and whether he was upset that Amy had totaled the BMW the night before her death. Carter said he knew she had a problem, but he did not realize how bad it was. Carter's secretary told him a few months before Amy's death about the money taken from the account on checks payable to Amy. He closed the account and opened a new one that she did not know about to keep it from happening again. He and Amy had both been unfaithful, but it was three and a half years before her death. He was upset that Amy had wrecked the car, especially since it just came out of the shop on Monday and she totaled it on Wednesday; he did not pick her up from the hospital Wednesday night because he was irritated, but by Thursday, they were not talking about it anymore. He learned a few weeks after Amy's death that the car insurance had lapsed a few days before the accident.

Carter did not know where Amy had been hiding the gun. He knew she had it because she refused to let him remove it from the house. He had removed all his other guns (about thirty) to his parents' house the previous November, because he was on probation from Tennessee for DUI, and one of the terms of probation prohibited guns in the home. He had bought the gun four or five years earlier, but he could not remember where or from whom.

Amy considered it her gun, and she was not willing to stay home by herself without protection.

Carter admitted that he had fired the gun before, and that it had a strong recoil.

### b. The Search Warrant

The day after Amy's death, Ellis secured a search warrant to return to the Carter

home. The probable cause affidavit stated:

> On April 14, 2011 this investigator responded to a Homicide at
> the residence of Tim and Amy Carter in the Flatwoods section of
> Lee Co. Amy Carter was found in the bathroom with a gun shot
> wound to the neck. Tim Carter the husband was the only person
> present at the residence when the shooting occurred. Tim
> Carter's statement that Amy Carter had shot herself was not
> consistent with the evidence found at the scene. Family members
> provided statements to Capt. Scott that Tim Carter had been
> physically abusive to Amy Carter in the past, that the two have
> major drug problems all of which has lead [sic] serious financial
> problems.
>                          ****
> I have personal knowledge of the facts set forth in this affidavit.
>                          ****
> This investigator processed the crime scene which was found to
> be not consisted [sic] to the statement made by Tim Carter and
> statements made by family members of his physically abuse [sic]
> to Amy Carter. Also this investigator has personal knowledge of
> Tim and Amy Carter drug use.

Tr. Hr'g on Mot. to Suppress, Feb. 10, 2015, Ex. 1, Aff. for Search Warrant, 2. During the

search of the house while Carter was still in the hospital, the officers seized a Blackberry phone,

three flip phones, a slide phone, the Toshiba laptop computer, the empty box for the .357

revolver, a lock blade knife, a black handled steak knife, eight .357 bullets, five .22 caliber

bullets, three strings, and three spoons.

The phones and computer were turned over to the Virginia State Police computer

evidence recovery section for analysis. The Blackberry was determined to be Amy's primary

phone. Text messages were sent to and from Amy's phone on April 14, 2011. Her last outgoing text was at 2:54 p.m. Eastern Daylight Time (EDT), and the last text she read was at 3:00 p.m. She had three unread text messages, received at 3:25 p.m., 5:06 p.m., and 7:13 p.m. At 9:30 p.m. on April 13, Amy had telephoned 911 following her car accident. Between that time and 2:00 a.m. the next morning, there were several phone calls to and from Amy's phone and Carter's phone and between Amy's phone and Chrissy Alford's phone. Many of the calls were attempts that did not go through, and most others lasted only one to three seconds. The longest call was forty-eight seconds, to Carter. Carter's phone reflected several calls to and from Amy that corresponded with those on Amy's phone, plus he received some calls directly from the hospital.

The computer analysis showed that the computer had been turned on at 8:21 a.m. EDT on April 14, 2011, and was idle from 9:37 a.m. to 12:16 p.m. and idle from 12:35 p.m. until 3:57 p.m. At 3:57 p.m., the bidding history site on eBay was accessed, and that site was refreshed at 4:17 p.m. EDT. However, the defense produced evidence that the eBay auction ran on Pacific Daylight Time (PDT), and the screen would have displayed PDT time, which was 1:17 PDT when the auction site was refreshed.

### c. What Was Not Investigated

Investigator Ellis acknowledged on cross-examination that the following was not done during his investigation: (1) No GSR test on either hand of Carter or his clothes; (2) No DNA test of blood on Carter's left hand or on bottom of his jeans; (3) No examination of bathroom door lock for tool marks; (4) No touch DNA analysis of gun by the lab, even though it had been requested by the Commonwealth's Attorney; and (5) No lab analysis of Amy's fingernail

clippings. In addition, Ellis never requested or received Amy's prior medical records, prescription records, or records of her psychiatric treatment.

### 5. The Forensic Evidence and Other Experts

#### a. Prosecution Experts

Doug DeGaetano, trace evidence analyst with the Division of Forensic Science (DFS), testified about analyzing the GSR kit taken from Amy. Amy had residue on both hands, with the heaviest concentration on her right index finger, webbing, and thumb, on both the palm side and back side of the hand. Those areas are where one expects to see the heaviest amount of residue if the person has fired a gun. Trial Tr. vol. 6, 58. However, the GSR test only reveals the presence of residue, not how the residue got there. A person may have residue if she fired a gun, was nearby when a gun was fired, or if she touched an item with residue on it. DeGaetano also noted that the .357 revolver expels a large amount of residue, because it is a large gun and because the residue not only comes out of the barrel but also from between the barrel and the cylinder. Id. at 55–73.

Wendy Gibson, firearm and tool mark analyst, testified that she examined and test-fired the .357 revolver. She noted that the hammer had two safety features on it that necessitated two to three times more force to pull the trigger. She described the gun as having a moderate force recoil, meaning that a person would need a tight grip to keep it from flying out of the hand when fired. In September 2012, the gun was returned to her with a request to determine the distance between the gun and victim at the time the gun was fired, but she was unable to make this determination because the fired casings and unfired ammo from the gun were never sent to her. Trial Tr. vol. 4, 15–51.

25

Blood was found on the hammer of the gun and on the left side of the grip. No blood or tissue was seen in the hammer well of the gun, so that area was not analyzed. Not enough material was obtained from the trigger to generate a DNA profile. The DNA from the blood on the hammer did not match Carter's DNA. The blood on the left side of the grip was a mixture of Amy's blood and Carter's blood. Trial Tr. vol. 6, 75–164. Carter's DNA was not found anywhere else on the gun, although the request for touch DNA analysis never reached the lab, and the hammer well was never swabbed. The lab never received the ammunition that remained in the gun nor the spent casings, so they were not tested for touch DNA or fingerprints, either. Trial Tr. vol. 4, 35–45.

Marjorie Harris, a blood stain pattern analyst with the DFS, explained the types of blood patterns at the scene. She discussed flow, spatter, transfer, and wipes. Two sources of blood spatter patterns were evident at the scene. First, back spatter blows back from a gunshot wound towards the gun when the bullet enters the body, unless it is a contact wound, which Amy's was not. The blood on Amy's right hand and tee shirt were consistent with back spatter, based on the size and directionality of the spatter. The pattern was not smudged, wiped, or otherwise interrupted by outside contact, and the pattern was consistent with self-inflicted injury. Had someone been holding her hand over the trigger and forcing her to shoot, the spatter pattern would not be there. Within fractions of a second after the bullet entered, forceful spurts of blood from Amy's severed carotid artery left large spatter patterns on the left wall of the bathroom, then flowed down the wall. Harris found spatter patterns on Amy's pajama bottoms, the upper right leg and the left leg with a greater volume of blood. A heavy flow pattern of blood down the left front of Amy's shirt came from non-arterial blood pouring

26

from the wound in her neck. That blood pooled in the floor and in two indentions on her shirt. The indentions matched the hammer and sight of the gun, which must have pressed against the shirt before the blood flowed down, or it would not have pooled there. Blood on tissues on top of the toilet tank appeared to have dripped straight down from Amy's right ear before her head fell to the left. All blood on Amy's hands reflected natural spatter and flow patterns, without disruption, except for her right index finger, which had a wipe pattern from something moving through the blood, probably the trigger itself. Trial Tr. vol. 6, 187–254.

Harris also talked about the blood patterns on Carter's hands, based on pictures taken by Investigators Scott and Ellis at the scene. The blood on Carter's right hand, along the web and index finger, were transfer stains, meaning that his hand had touched wet blood. Carter also had a minimal transfer stain on the palm of his left hand and some transfer stains on his jeans, above the knees. Harris could say only that these stains came from contact with wet blood; she could not say what surface the blood came from. Trying to clean blood off the floor would be one possibility. Harris saw no spatter stains on Carter's hands or jeans; if he had been at an intermediate range from Amy, with his left hand near the hammer and his right hand on the barrel when the gun fired, Harris would have expected Carter to be hit by spatter. Id. at 173–82.

James Kuhlman, a forensic toxicologist at DFS, testified that blood drawn from Amy after her death was positive for the presence of Xanax and Oxycodone, although he could not accurately state how much of each drug was in her system before her death. Kuhlman testified that people who abuse drugs like Xanax and Oxycodone can develop a tolerance, giving them the ability to function at drug levels which would be fatal to an average non-user. Both drugs

work as central nervous system depressants, which can leave users feeling lethargic, drowsy, uncoordinated, and with slurred speech. When taken together, that effect could be stronger than taking either drug alone. Kuhlman had also tested Amy's blood in 2010, when she was charged with DUI; on that date, she had .22 mg per liter of Oxycodone in her system, which is a high amount, and .27 mg per liter of Xanax, which is three to four times higher than the therapeutic range of .06 – .1 mg per liter. Id. at 257–76.

By agreement of counsel, a redacted and sanitized version of the autopsy report was introduced into evidence without the testimony of the medical examiner who conducted the autopsy. Essentially, the report indicated that Amy died of a gunshot wound to the neck. Def. Ex. 185.

### b. Defense Experts

Dr. Jack Daniels testified as a board-certified forensic pathologist. Trial Tr. vol. 9, 188–206. Based upon his training, years of experience, and review of Amy's records and autopsy report, Dr. Daniels testified that the entry wound on Amy's neck was consistent with a self-inflicted wound. The entrance wound was round, with blackened edges, and there was a little soot and red dots further out from the wound, indicating that the gun was within a few inches from but not in direct contact with her skin at the time it was fired. Further, the positioning of the gun in her hand was consistent with her having fired the fatal shot. Because the bullet severed her trachea, Amy would have been dead almost immediately, within a few seconds of the shot. He testified that the blood pattern on her hand also was consistent with self-inflicted injury. Id. at 207–18, 256–67. Dr. Daniels also testified that Amy's time of death could not

have been earlier than 4:00 p.m., because rigor mortis begins within two to four hours of death, and there was no rigor mortis when the hospital declared her dead at 8:15 p.m. Id. at 274–75.

Dr. Daniels identified a sharp area on the rear site of the gun, near the hammer, which would be consistent with the injury to Carter's left hand. Id. at 272–75. Finally, he testified about the effects of diabetic ketoacidosis, which affects a person's physical and mental capabilities by impairing judgment and communication and reducing responsiveness to surroundings; he said that ketoacidosis can make a person appear intoxicated. Id. at 276–87. On cross examination, he conceded that he had not reviewed Carter's medical records, nor had he seen or read the statements Carter gave police.

The defense also introduced the testimony of Dr. Avram Mack, a medical doctor with board certification in general psychiatry, child psychiatry, addiction psychiatry, and forensic psychiatry. Based upon his training, experience, and review of Amy's records, Dr. Mack opined that Amy was at increased risk of suicide in April 2011 because of (1) her abuse of opiates, Xanax, and tobacco; (2) her prior history of depression; (3) her prior history of anxiety and panic disorder; (4) her maladaptive coping style; and (5) new stressors in her life in April 2011, including legal issues, recent sexual assault, new acute pain from the car accident, concussion, and lack of future-oriented thinking. He further opined that Amy would have been a good candidate for psychiatric hospitalization, but that getting an involuntary commitment would be more difficult. Trial Tr. vol. 10, 49–100. On cross-examination, Dr. Mack explained the differences in impact between alcohol and Xanax. Whereas alcohol produces a euphoric phase followed by a depressive phase, Xanax has no exuberance phase, just depressive. Xanax does

29

not cause blackouts, as alcohol can, but Xanax can impair memory and reduces the brain's capacity to form memories. Id. at 100–73.

## B. Procedural History

On April 1, 2014, approximately three years after Amy died, a Lee County grand jury indicted Carter for the first-degree murder of Amy and use of a firearm in the commission of murder. The court appointed a special prosecutor, as the Commonwealth's Attorney for the jurisdiction recused himself from the case.

The jury trial ran from April 13, 2015, through April 28, 2015, during which the evidence discussed in the factual background section of this opinion was introduced. At no point did the trial court engage Carter in a colloquy to determine if he had voluntarily and knowingly waived his constitutional right to testify. After closing arguments, the jury was instructed on first-degree murder, second-degree murder, voluntary manslaughter, and involuntary manslaughter, as well as defense instructions on accidental death and intoxication as a defense to first-degree murder only. Trial Tr. vol. 11, 52–60. The jury returned verdicts of guilty on second-degree murder and use of a firearm to commit murder on April 28, 2015. Trial Tr. vol. 12, 5–7.

The Commonwealth introduced Carter's prior record, consisting of two driving while impaired/under the influence convictions, one in 2002 and one in 2010, and a misdemeanor possession of controlled substances in Mississippi in 2006. Several witnesses testified for the defense, including business owners who had worked with Carter's business, his sister-in-law Teresa Carter, and a woman from his church who he met eighteen months before the trial. They all testified that he was honest, trustworthy, and a devoted father. After further

30

deliberations, the jury returned a sentence of twenty years for murder and three years for use of a firearm in the commission thereof. Id. at 69–72. The court ordered a presentence report and set the matter over for further proceedings. The defense filed several post-trial motions, all of which were denied.

The court received and reviewed the presentence report and presided over the final sentencing hearing on October 23, 2015. After considering the arguments of counsel, the trial court imposed the sentence recommended by the jury. The sentencing order was entered November 9, 2015.

Carter appealed to the Court of Appeals of Virginia, raising the following issues: Sufficiency of the evidence to support the murder conviction, failing to grant a mistrial when the prosecutor improperly inserted himself into the case by trying to replicate Carter cutting his hand on the firearm, failing to grant a new trial because of improper contact between the prosecution and a juror, failing to instruct the jury on suicide, instructing the jury on mutual combat without giving a self-defense instruction, allowing the prosecution to treat Scott Alford as a hostile witness, allowing Investigator Ellis to testify that Alford told him Carter said, "I've got 120 Xanaxes, and that don't do it, I've got a .357" without giving a limiting instruction on use of the testimony, and failing to grant his motion to suppress evidence obtained pursuant to the search warrant the day after Amy's death. The Court of Appeals denied Carter's appeal and affirmed the conviction and sentence. Carter v. Commonwealth, No. 0048-16-3 (Va. Ct. App. Nov. 1, 2016). The Supreme Court of Virginia refused Carter's petition for appeal on September 11, 2017 and denied his petition for rehearing on November

21, 2017. The United States Supreme Court rejected his petition for certiorari on March 26, 2018.

On November 20, 2018, Carter filed a petition for a writ of habeas corpus in the Lee County Circuit Court, raising the following issues:

(1) Ineffective assistance of counsel for failing to object to the stun gun maintained on Carter during the trial.

(2) Violation of his Sixth Amendment right to a fair trial by an impartial jury by seating a juror who had advised the bailiff she was afraid for her life if she had to be on the jury, after the bailiff told her that Carter would not know who she was because her identity was confidential; neither the bailiff nor the juror advised the court of this conversation before jury selection or before the jury was sworn in.

(3) Ineffective assistance of counsel in failing to move for a mistrial when the prosecutor injected impermissible testimony, evidence, and argument.

(4) Ineffective assistance of counsel and denial of Carter's due process right to a fair trial by allowing the prosecutor to call Ellis, a third party, to impeach the Commonwealth's own witness with prejudicial hearsay.

(5) Ineffective assistance of counsel and denial of his right to testify when defense counsel refused to allow Carter to testify on his own behalf.

(6) Ineffective assistance of counsel in failing to present a proper jury instruction on the defense of suicide.

(7) Cumulative errors of counsel prejudiced the defendant.

On September 24, 2019, the trial court wrote a detailed opinion letter, explaining her denial of Carter's habeas claims. Carter v. Clarke, No. CL18110233, Letter Op., ECF No. 1-2, at 5 (Lee Co. Cir. Ct. Sept. 24, 2019). The court entered the final order dismissing the petition on November 18, 2019, incorporating the letter of September 24. Order, ECF No. 1-1. The Virginia Supreme Court denied Carter's habeas appeal on November 19, 2020.

Carter timely filed the current § 2254 petition on February 23, 2021, raising the following issues, all of which have been exhausted:

1. Carter's right to a fair trial before an impartial jury was violated when a juror told a bailiff that she feared for her life, and the bailiff incorrectly responded that Carter would not know who she was because her identity was confidential.

2. Carter's due process right to a fair trial was violated, and his counsel was ineffective for failing to timely object and request a mistrial, when the prosecution elicited prejudicial hearsay testimony from Investigator Ellis about statements Scott Alford made to the police about what Carter said to Alford.

3. Carter was denied his constitutional right to effective assistance of counsel, and his structural due process rights were violated, when defense counsel prevented Carter from testifying in his own defense.

## II.

A federal court may grant a petitioner habeas relief from a state court judgment if the petitioner is in custody in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a). However, federal courts reviewing claims that have been adjudicated on the merits in the state court may grant relief on such a claim only if the state court's decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(1)–(2). Further, the federal court must presume that the state court's factual findings are correct, and this presumption can be overcome only "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). The standard is difficult to meet, and it was intended to be so. Harrington v. Richter, 562 U.S. 86, 102 (2011).

When reviewing a claim of ineffective assistance of counsel, courts also apply a highly deferential standard. A petitioner must show that (1) counsel's performance was so deficient

33

that he was not functioning as counsel guaranteed by the Sixth Amendment, and (2) that the deficient performance prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 687 (1984). Thus, when reviewing a state court's assessment of an ineffective assistance of counsel claim, federal review is "doubly deferential," because the deferential standard of review under the statute overlaps with the deferential standard under Strickland. Cullen v. Pinholster, 563 U.S. 170, 190 (2011). In other words, the federal court is to afford "both the state court and the defense attorney the benefit of the doubt." Burt v. Titlow, 571 U.S. 12, 15 (2013).

Deficient performance requires a showing that counsel's performance fell below "an objective standard of reasonableness" "under prevailing professional norms." Strickland, 466 U.S. at 688. The reviewing court must not rely upon "the distorting effects of hindsight," but must presume that counsel's decisions and actions fell within the wide range of reasonable strategy decisions. Id. at 689–90. To establish prejudice under Strickland, Carter must show that there was "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," which means "a probability sufficient to undermine confidence in the outcome." Id. at 694.

Using the standard of review required by § 2254(a) and the criteria in Strickland, the court will address each of Carter's claims.

## A. Right to Trial by Fair and Impartial Jury

In October 2018, long after Carter's trial, an investigator for Carter spoke with the juror who had said she did not feel safe. She said, "This was brought up to the bailiff when we were in there—we're like, 'I really don't want to do this because these people could come back and kill us' and he's like 'they won't even know who you are' and now people are coming to talk

to me about it and I don't understand how my name got out." Letter Op., ECF No. 1-2, at 5. During her interview with the investigator, the juror indicated that this conversation happened before voir dire, before she was ultimately selected to be a juror in the case. The bailiff did not advise the court or counsel of the juror's concerns or of his response to her.

Carter argues that this constituted an improper communication with the juror and served to implicitly undermine Carter's presumption of innocence because a juror would have no reason to be afraid of a person presumed to be innocent. By telling her—inaccurately— that juror names and information were kept confidential, the bailiff implicitly suggested that the court felt it necessary to take precautions to protect jurors from "dangerous defendants."

In denying this claim, the state habeas court[3] correctly cited Remmer v. United States, 347 U.S. 227 (1954), as the controlling Supreme Court authority. Remmer holds that any private communication with a juror about the matter pending before the jury is deemed presumptively prejudicial. Id. at 229. A petitioner must make two showings for the presumption of prejudice to arise: (1) that an extraneous communication with the juror occurred and (2) that the communication was about the matter pending before the jury. Lenz v. Warden of Sussex I State Prison, 267 Va. 318, 329, 593 S.E.2d 292, 298 (2004). The state habeas court found, as a factual matter, that the bailiff's communication was not about the trial pending before the tribunal. Letter Op., ECF No. 1-2, at 6. The bailiff did not talk about Carter's guilt or innocence, did not discuss evidence in the case, and did not render any

---

[3] The Lee County Circuit Court issued the only reasoned opinion in the state habeas case, as the Supreme Court of Virginia denied the habeas appeal. On federal habeas review, the court "looks through" the high court's denial and reviews the reasoning of the last reasoned state court opinion. Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991) (holding that federal habeas court must presume that "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground").

opinions about how the case should be determined. This factual finding is entitled to a presumption of correctness under 28 U.S.C. § 2254(e)(1). A federal habeas court can only grant relief on this claim if the court finds the determination of facts to be unreasonable, in light of the evidence presented to the state court. 28 U.S.C. § 2254(d)(2).

The question is not whether the federal court would reach the same factual findings, or even whether the federal court believes the state's factual findings are wrong. The court must find more than just an incorrect determination of facts, as "unreasonable determination of the facts" is "a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473 (2007). This court cannot say that the state court unreasonably determined that the bailiff's communication with the juror was not about the case pending before the jury. Accordingly, the court cannot grant relief on this claim.

## B. Prejudicial Hearsay from Investigator Ellis to Impeach Alford's Testimony

### 1. Due Process Claim

The Commonwealth called Scott Alford as a prosecution witness. The prosecutor asked Alford to whom Carter spoke on the phone on April 13, 2011, when Alford drove Carter home, and what Carter said to her. Alford testified that he did not know for sure who Carter was talking to and he could not remember what Carter said. He conceded that the call was probably with Amy. When reading the transcripts of his recorded statements to Investigator Rouse did not refresh his memory, the court declared Alford a hostile witness, allowing the prosecutor to cross-examine Alford because "[i]t appears to me, certainly, from watching his demeanor on the stand, that he appears to be evading questions." Trial Tr. vol. 7, 174. After additional argument, the trial court stated: "The witness has openly, by his

36

demeanor, demonstrated hostility toward the questions being asked. . . . He also is argumentative and unresponsive to the questions that are being asked of him." <u>Id.</u> at 178–79. After reviewing a Virginia Court of Appeals case cited by defendant, <u>Ramsey v. Commonwealth</u>, 63 Va. App. 341, 757 S.E.2d 576 (Va. Ct. App. 2014), the court stated:

> This witness based upon my observation of his demeanor, his argumentative manner with the Commonwealth, his evasiveness, in my opinion has shown hostility in fact. And, I believe that since he has shown hostility in fact, that he can be called as an adverse witness and cross examined. And I am going to allow that. Certainly, it's over the objection of the defense.

Trial Tr. vol. 7, 183. Following this ruling, defense counsel reiterated its objection that a proponent of a witness may not impeach that witness by means of an inconsistent statement. <u>Id.</u> The court responded, citing Virginia Rule of Evidence 2:607(c) that "[i]f a witness proves adverse, the party who called the witness may, subject to the discretion of the court, prove that the witness has made at other times a statement inconsistent with the present testimony as provided in Rule 2:613." <u>Id.</u> at 184. The colloquy between defense counsel and the court continued:

> BY TIMOTHY MCAFEE: Well, if you're going to permit it, Judge, we're going to ask that you give a cautionary instruction to the jury that these prior statements are not evidence of the truthfulness—are not evidence of the truthfulness—are not evidence of those facts, and only used to impeach the witness. And, due to the inflammatory nature of these, Judge, we believe that the probative value associated with these prior statements outweighs any—the prejudicial value of these prior statements outweighs any probative value, and should be excluded under rule 403.
>
> BY THE COURT: Well, I am going to respectfully overrule the objection. Now if—this is a rather general objection; and again, I don't want to, in any way, cut you off at making more specific objections. If we get to the point that other documents

> are offered to impeach the witness, I don't know—and no one
> does at this point—exactly what the witness is going to say when
> he's recalled to the stand. So we'll simply have to address that at
> the appropriate time. All right, is everyone ready?

Id. at 184–85.

The prosecution then read several statements from the transcript and asked Alford, after each statement, if Alford told police that this was what Carter had said. Alford responded, "If that's what it says," but maintained that he had no independent memory of the conversation. There was no recording or transcript of an alleged discussion between Carter and Investigator Ellis. When asked if he told Investigator Ellis that Carter said, "I've got 120 Xanaxes, and if that don't do it, I've got a .357," Alford stated he did not remember making such a statement.

Defense counsel extensively objected, outside the presence of the jury, to Alford being declared an adverse witness and to witnesses (Rouse and Ellis) being called to impeach Alford, arguing that the Commonwealth was not allowed to impeach its own witness with testimony from another person about a prior inconsistent statement. Trial Tr. vol. 7, 173–85. Counsel also argued that the impeachment testimony was more prejudicial than probative, and should be excluded under Virginia Rule of Evidence 2:403.[4] Id. at 184. Next, although defense counsel asked the court to find that his objection was a continuing one, so that he would not have to disrupt proceedings by objecting to every question, id. at 185, the court did not rule on that request. The court stated: "We'll just have to see what the Commonwealth brings forth, and

---

[4] Virginia Rule of Evidence 2:403 provides: "Relevant evidence may be excluded if: (a) the probative value of the evidence is substantially outweighed by (i) the danger of unfair prejudice, or (ii) its likelihood of confusing or misleading the trier of fact; or (b) the evidence is needlessly cumulative."

hear those objections at the appropriate time. I don't want to in any way limit your ability to make an objection." Trial Tr. vol. 7, 187.

The Commonwealth next called Investigator Rouse to impeach Alford regarding his testimony that he could not recall statements made by Carter on his cell phone while Alford was driving Carter home on the night of Amy's car accident. Rouse testified that the transcript of his prior interview with Alford indicated as follows:

> Q. Mr. Rouse, look at lines 21 through 24 on that same page, please.
>
> A. Okay. Do you want me—
>
> Q. Could you read what Mr. Alford told you?
>
> A. Yes. It says, well, I remember something about, yeah, that's no more Mercedes or BMW, whatever it is, you know that f***ing car, you know, I am not fixing it again.
>
> Q. And, did Scott Alford tell you that was something, in those words, that he overheard Tim Carter say?
>
> A. Yes.

Id. at 219. Defense counsel objected repeatedly throughout the examination of Rouse that many of Alford's statements in the Rouse interview transcript were not inconsistent with his trial testimony, and several of those objections were sustained. Id. at 221–23.

The Commonwealth then recalled Investigator Ellis to testify about a conversation he had with Alford in the courthouse while attending an unrelated court proceeding. Ellis testified as follows:

> Q. All right. Tell the jury what happened then when he approached you; what did you all do?

39

> A.      Okay. Myself and Scott Alford, we went down the elevator to the second floor and went outside on the sidewalk. Scott asked me, he said, do you—do you think Tim Carter is going to go away for a while? And I said, well, I can't answer that; that's up to the court. And, he said, well—he said, I didn't tell you something. He said, but I want to tell you. He said, Tim made the comment the night of the accident, said that I was taking him home, and said he made a comment. He was talking on the phone. He said, now, I can't swear who was on the other end, but he made a comment that I've got 300—I got 120 Xanaxes, and if that don't do it, I've got a .357.
>
> Q.      And, are you sure he said that?
>
> A.      That's what Scott Alford told me.

Id. at 233–34. Defense counsel made no objections during Ellis's brief recalled testimony. Id. at 231–37. On cross-examination, Ellis stated that Alford's comment was important, but he did not document it in writing. Id. at 234.

In sum, regarding Alford's testimony, defense counsel made the following objections to the Commonwealth's questioning: (1) to the Commonwealth being allowed to cross-examine Alford as an adverse witness; (2) to the Commonwealth's impeachment of its own witness by questioning him about inconsistent statements made to Rouse and Ellis; and (3) that this testimony be excluded under Virginia Rule of Evidence 2:403 as its probative value was substantially outweighed by the danger of unfair prejudice. At no point during the testimony of Rouse or Ellis did defense counsel object that Alford's statements were hearsay within hearsay and that there was no exception available to admit Alford's prior statements to Rouse or Ellis for the truth of the matter asserted, i.e., that Carter actually made those statements to Alford.

40

On direct appeal, the Court of Appeals of Virginia held that the trial court had erred in treating Alford as an adverse witness and allowing him to be impeached by his prior inconsistent statements, quoting <u>Maxey v. Commonwealth</u>, 26 Va. App. 514, 495 S.E.2d 536 (1998):

> Code § 8.01-403 allows a party to impeach his or her own witness by prior inconsistent statements only when the witness whom the party expected to testify favorably has suddenly given unexpected, adverse testimony on the stand.

26 Va. App. at 519–20, 495 S.E.2d at 539. Further, the witness must have given more than a contradictory statement on a prior occasion; rather, his current testimony must be "injurious or damaging to the case of the party who called the witness." <u>Ragland v. Commonwealth</u>, 16 Va. App. 913, 920–21, 434 S.E.2d 675, 680 (1993). The court of appeals noted that while Alford's inability to remember the details of a conversation years earlier "did not meet the expectations of the Commonwealth, it was not damaging to the Commonwealth's case." <u>Carter v. Commonwealth</u>, No. 0048-16-3, slip op. at 13 (Va. Ct. App. Nov. 1, 2016). Therefore, Alford should not have been treated as a hostile witness, should not have been subject to cross-examination, and should not have been impeached by prior inconsistent statements through the testimony of Rouse and Ellis, and the trial court had abused its discretion. <u>Id.</u> at 14.

The Virginia Court of Appeals then held the trial court's error to be harmless as a matter of law. The court explained:

> In this instance, the remaining evidence against Carter in the light most favorable to the Commonwealth was substantial. On this record, the benefit the Commonwealth improperly received from the trial court by erroneously declaring Alford to be hostile was the ability to ask leading questions of their own witnesses and the

41

> admission of a statement made to the investigator that Carter had told him "I've got 120 Xanaxes, and if that don't do it, I've got a .357." Based upon our review of the record and the other evidence, including Carter's failure to timely object to the admissibility of Alford's prior statement and the curative instruction given by the trial court discussed more fully below, we conclude that declaring Scott Alford a hostile or adverse witness did not affect the verdict or otherwise deprive Carter of a fair trial on the merits.

Id. at 14–15.[5]

The Virginia Court of Appeals next concluded that counsel did not contemporaneously object to Ellis's testimony about that statement, instead making a general objection before the testimony "that any prior statements made by Alford would be more prejudicial than probative." Id. at 16. During the lengthy discussion outside the presence of the jury, the planned testimony of Investigator Ellis to impeach Alford was clearly the subject of the discussion. Trial Tr. vol. 7, 173, 180. The only prior statement made by Alford to which Ellis testified was the statement about the 120 Xanaxes and the .357. Nevertheless, the appellate court held that Carter defaulted his objection to the statement by failing to make a contemporaneous objection. The court concluded:

> Here, the record fails to show that Carter contemporaneously objected to the prosecutor's inquiry regarding that particular prior statement attributed to Scott Alford on the same grounds he now asserts on appeal. Rather, Carter offered a general objection, prior to the effort to impeach Alford, that any prior statements made by Alford would be more prejudicial than

---

[5] While the Virginia Court of Appeals later addressed Carter's failure to contemporaneously object to the admissibility of Investigator Ellis's hearsay testimony regarding Alford's prior statement about the 120 Xanaxes and .357, the court did not later address the issue of a curative instruction, other than to frame Carter's argument. Id. at 15. In any event, while no contemporaneous limiting instruction was asked for or given during Ellis's testimony, the jury was instructed at the close of the evidence as follows: "If you believe from the evidence that a witness previously made a statement inconsistent with his testimony at this trial, the only purpose for which that statement may be considered by you is its bearing on the witness's credibility. It is not evidence that what the witness previously said is true." Trial Tr. vol. 11, 56–57.

> probative. Thus, pursuant to Rule 5A:18, Carter failed to make an argument in the trial court in reference to the specific statement now identified. Therefore, we hold that Carter may not argue it for the first time on appeal.

Id. at 16.

In the absence of proper impeachment, Ellis's testimony that Alford told him that he overheard Carter say that he had "120 Xanaxes and if that don't do it, I've got a .357," is hearsay within hearsay. Offered for the truth of the matter asserted, such hearsay is not only inadmissible under rules of evidence, but also violates a defendant's confrontation rights under the Sixth Amendment and due process right to a fair trial under the Fifth Amendment.

Carter raised this issue again in his state habeas petition. In the September 24, 2019, Letter Opinion, the state habeas court did not rule on the substantive due process violation, addressing only the ineffective assistance of counsel claim for defense counsel's failure to object to this testimony and move for a mistrial. In an Order entered on November 18, 2019, however, the state habeas court held that the due process claim associated with the admission of the hearsay testimony "could have been raised at trial, adjudicated at trial, and pursued on appeal if appropriate." Order, ECF No. 1-1, at 3. The state habeas court concluded that because this claim "could have been raised at trial or on appeal," it is barred by Slayton v. Parrigan, 215 Va. 27, 205 S.E.2d 680 (1974). In Slayton, the Virginia Supreme Court held:

> The trial and appellate procedures in Virginia are adequate in meeting procedural requirements to adjudicate State and Federal constitutional rights and to supply a stable record for possible habeas corpus review. A prisoner is not entitled to use habeas corpus to circumvent the trial and appellate processes for an inquiry into an alleged non-jurisdictional defect of a judgment of conviction.

215 Va. at 30, 205 S.E.2d at 682.

43

The Virginia Court of Appeals held that Carter waived the claim on the basis of the contemporaneous objection rule. The contemporaneous objection rule has long been recognized as an independent and adequate state law ground for dismissing a habeas claim, and when procedural default occurs because of an independent and adequate state law, the claim also is defaulted for purposes of federal review. Wainwright v. Sykes, 433 U.S. 72, 91 (1977); Conquest v. Mitchell, 618 F.2d 1053, 1055–56 (4th Cir. 1980). That this issue may have been procedurally defaulted, however, does not end the inquiry. A petitioner may overcome procedural default on a showing of cause for the default and actual prejudice as a result of the claimed constitutional violation. Coleman v. Thompson, 501 U.S. 722, 750 (1991). Carter has not asserted any cause for procedural default, perhaps relying on the claim for ineffective assistance of counsel. However, the court cannot make a finding of cause when no supporting facts have been alleged. Because Carter has not shown cause for procedural default, the court cannot consider his due process claim based on the admission of the hearsay statements attributed to Carter.

### 2. Ineffective Assistance of Counsel

Nonetheless, both in his state habeas petition and here, Carter raises the issue of the admission of the hearsay statements, this time through an ineffective assistance of counsel claim.

In its habeas decision, the state trial court addressed on the merits Carter's claim of ineffective assistance of counsel for failing to object to admission through Investigator Ellis of the "I've got 120 Xanaxes, and if that don't do it, I've got a .357" hearsay statement. In its analysis of the issue, the state habeas court first held that Carter's counsel was not ineffective

44

for failing to object to the questions posed by the prosecution to Alford because defense counsel repeatedly objected to those questions and had a number of objections sustained. The court agrees with the state habeas court that defense counsel's persistent objections to Alford's testimony, including his treatment as an adverse witness and impeachment by questions referencing his prior statements, were timely and appropriate. As such, the court agrees that defense counsel was not constitutionally ineffective with regard to the prosecution's questioning of Alford.

The state habeas court next concluded that defense counsel was not ineffective by failing to object to the testimony of Investigator Ellis regarding the 120 Xanaxes and the .357 statement, ruling as follows: "At the Petitioner's trial, considering the information that his counsel had elicited on cross examination from the aforesaid three witnesses and the circumstances as they then existed, it is not unreasonable that counsel elected to not object to the statement at issue when testified to by Investigator Ellis." Letter Op., ECF No. 1-2, at 9.

The court agrees. To show deficient performance, Carter must show that counsel's performance failed to meet an objective standard of reasonableness under prevailing professional norms. Strickland, 466 U.S. at 688. In matters of strategy, a habeas court must not rely on "the distorting effects of hindsight," but must presume that counsel's decisions fell within the wide range of reasonable strategy decisions. Id. at 689–90. What arguments to make and what evidentiary objections to raise are generally considered to fall within the range of strategy decisions that are owed the highest deference. Gonzalez v. United States, 553 U.S. 242, 248–49 (2008). Decisions to refrain from objecting to clearly inadmissible evidence have

been routinely upheld as reasonable, especially when counsel is concerned about drawing the jury's attention to unfavorable evidence.

The state habeas court's conclusion that counsel's performance was not defective is reasonable. In reaching this conclusion, the court must consider the events of the trial as they were unfolding and not with the benefit of hindsight. Prior to Ellis taking the witness stand for the second time, defense counsel had been fighting a losing battle to keep Alford's prior statements from the jury. More than ten pages of trial transcript are consumed by defense counsel's vehement objection to the Commonwealth's use of Alford's prior statements. Over and over, the trial court disagreed with defense counsel, first, by allowing Alford to be treated by the prosecution as an adverse witness; second, by allowing the prosecution to question Alford about his prior statements to Investigators Rouse and Ellis containing inflammatory statements attributed to Carter; and, third, by allowing the prosecution to question Rouse about alleged prior inconsistent statements by Alford. Given this track record, at the time Ellis was recalled as a witness, there was no reasonable likelihood that a defense objection to his testimony would have been sustained. Given the trial court's consistent prior rulings allowing Alford to be impeached by being asked about prior statements he made to Rouse and Ellis and the trial court's decision to allow the prosecution to call Rouse and Ellis to repeat these statements to impeach Alford, it was reasonable for counsel to conclude that another objection during the Ellis testimony could have highlighted this issue for the jury to Carter's detriment. Counsel's strategic choice at that point not to raise a futile objection and instead cross-examine Ellis on his failure to document the "important" Alford comment about the 120 Xanaxes and the .357 was not unreasonable given the court's prior rulings and the context in which the Ellis

46

testimony was received.[6] Accordingly, even though the Virginia Court of Appeals did not allow a direct appeal on this issue because of defense counsel's failure to make a contemporaneous objection, the court cannot conclude that counsel's persistent objections and efforts to keep the jury from hearing the testimony about Alford's statements to Rouse and Ellis, rebuffed time and again by the trial court, to be constitutionally deficient performance. Accordingly, this claim must fail.[7]

---

[6] It is worth noting that the particular question asked of Investigator Ellis that elicited the 120 Xanaxes and .357 comment was not, in and of itself, objectionable. The prosecution asked Ellis "All right. Tell the jury what happened when then he approached you; what did you all do?" Trial Tr. vol. 2, 233. Ellis answered this rather open-ended question by mentioning the Xanaxes and .357 comment. To be sure, counsel could have objected when Ellis first began to mention a comment by Carter. At this point, however, there was no indication that the trial court would have done anything other than to overrule the objection, highlighting the issue for the jury. In the heat of the moment, and in the circumstances facing counsel, the court cannot conclude that defense counsel was ineffective in deciding not to object to Ellis's testimony. This conclusion is consistent with the Declaration of co-counsel Sidney Kolb, where he states that "we had no reason not to object, other than it would have drawn focus to the statement and I didn't think that the judge would keep it out. It was highly prejudicial and we did not want the jury to hear it." Kolb Decl., ECF No. 14, at 25 ¶ 15.

[7] The court, however, will issue a certificate of appealability as to Claim Two for the following reasons.

On direct appeal, the Virginia Court of Appeals concluded that "the trial court abused its discretion in finding Scott Alford a hostile and adverse witness solely as a consequence of his desire to be evasive." Carter v. Commonwealth, No. 0048-16-3, ECF No. 1-4, at 16. As a consequence of its finding that Alford was an adverse witness, the trial court permitted the prosecution to introduce otherwise inadmissible hearsay testimony from Investigators Rouse and Ellis, including the highly prejudicial "I've got 120 Xanaxes, and if that don't do it, I've got a .357" statement attributed to Carter. The Virginia Court of Appeals, relying on the contemporaneous objection rule, held that Carter waived assignment of error as to the admission of Alford's prior statements to investigators as to what he told them he heard Carter say on the telephone on the night of Amy's car accident.

The court "must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts. The standard for a certificate of appealability requires the applicant to make a substantial showing of the denial of a federal constitutional right. See Slack v. McDaniel, 529 U.S. 473, 483–84 (2000). To make a substantial showing, a party must demonstrate that the issues are subject to debate among jurists of reason, that a court could resolve the issues in a different manner, or that the questions presented are worthy of encouragement to proceed further. See id. The severity of the penalty may be considered in making this decision, and any doubt about whether to grant a certificate of appealability should be resolved in favor of the movant. Longworth v. Ozmint, 302 F. Supp. 2d 569, 571 (D.S.C. 2003) (citing Clark v. Johnson, 202 F.3d 760, 764 (5th Cir. 2000)).

In looking at this issue closely, the court concluded that it could not reach the due process violation and that, while defense counsel did not object to Investigator Ellis's recalled testimony reciting the 120 Xanaxes and .357 statement, the failure to object at that point was not constitutionally ineffective under the circumstances facing defense counsel at the time. However, the court finds that reasonable jurists could debate this point, a court

## C. Denial of Right to Testify

Carter asserts a claim of ineffective assistance of counsel based upon his lawyer's refusal to permit him to testify at trial. The state habeas court determined as a factual matter that trial counsel's performance was deficient. Counsel did not advise Carter that he had a right to testify and that the decision to testify belonged to Carter, not to counsel. When Carter told his attorneys that he wanted to testify, lead counsel told Carter that he could not allow Carter to testify. He then rested the case and did not call Carter to the stand. Letter Op., ECF No. 1-2, at 11. The factual findings are supported abundantly by the record, including affidavits from both defense attorneys and from Stephanie Ward, a friend of Carter's who was present in the conference room with Carter at the courthouse.

### 1. Deficient Performance

The state habeas court found that counsel's conduct constituted deficient performance under federal law. In recognizing a constitutional right to testify in one's own defense, the Supreme Court explained the numerous constitutional foundations for this right. Rock v. Arkansas, 483 U.S. 44, 51–53 (1987). First, the right to testify is derived from the Due Process Clause, applicable to the states through the Fourteenth Amendment, which guarantees that one shall not be deprived of liberty without due process of law. Due process includes, at a minimum, the right to be heard in one's defense. Id. at 51. Second, the Compulsory Process Clause of the Sixth Amendment gives defendants the right to call witnesses in their favor; logically included in this right is the right to testify as a witness in one's own behalf. Id. at 52.

---

could resolve the issue in a different manner, and that the questions presented are worthy of further consideration. Accordingly, a certificate of appealability is granted for Claim Two.

This right is personal to the defendant, not to counsel. Finally, the right to testify is the natural corollary to the Fifth Amendment's protection against compelled testimony; the right to remain silent is not a choice unless a defendant also has the right to speak in his own defense if he chooses to do so. Id. at 53.

The defendant has the ultimate authority to make certain fundamental decisions regarding his case, including whether to plead guilty, waive a jury trial, testify in his own behalf, or appeal his conviction or sentence. Jones v. Barnes, 463 U.S. 745, 751 (1983); McCoy v. Louisiana, 138 S. Ct. 1500, 1508 (2018). As the McCoy Court stated, "These are not strategic choices about how best to achieve a client's objectives; they are choices about what the client's objectives in fact are." 138 S. Ct. at 1508. Indeed, the ethical duties of an attorney require a lawyer to "abide by a client's decisions concerning the objectives of representation . . . . In a criminal case, the lawyer shall abide by the client's decision, after consultation with the lawyer, as to a plea to be entered, whether to waive jury trial, and whether the client will testify." Va. Rules of Prof. Conduct Rule 1.2(a). American Bar Association Standards for Criminal Justice also recognize that the decision whether to testify is "to be made by a competent client after full consultation with defense counsel." Criminal Justice Standards, Standard 4-5.2(b)(vi) (4th ed. 2017).

As the Eleventh Circuit Court of Appeals noted, a defense attorney who refuses to accept the defendant's decision to testify and refuses to call him to the stand is acting unethically by preventing the defendant from exercising his constitutional right to testify; if defense counsel never informs the defendant of the right to testify and that the ultimate decision is the client's, counsel is negligent in performing the vital professional responsibility

of protecting the client's right to testify and ensuring that any waiver of the right is knowing and voluntary. Either way, the defendant clearly has not received reasonably effective assistance of counsel. United States v. Teague, 953 F.2d 1525, 1534 (11th Cir. 1992).

The state habeas court found that Carter's counsel was ineffective for failing to tell him he had a constitutional right to testify on his own behalf and refusing to let him testify when he asked to do so, thus satisfying the first prong of the Strickland ineffective assistance of counsel test. The court agrees with that finding.

### 2. Prejudice

Despite finding that Carter's counsel rendered ineffective assistance, the state habeas court denied Carter's claim on the grounds that there was no reasonable likelihood of a different outcome if Carter had testified, and therefore he failed to establish the prejudice prong of Strickland. The state habeas court cited Teague and Cannon v. Mullin, 383 F.3d 1152 (10th Cir. 2004), to support using the Strickland "reasonable probability" standard for prejudice to evaluate Carter's claim.

Carter argues that the state court erred in two respects in denying his habeas claim based on his right to testify. First, he argues that the denial of his right to testify was structural error and not subject to a prejudice analysis. Second, he argues that even if the error is subject to a prejudice analysis, he suffered prejudice when he was not allowed to testify.

### a. Necessity of Showing Prejudice

In Weaver v. Massachusetts, 137 S. Ct. 1899 (2017), the Supreme Court discussed at length the interplay between structural errors during trial and claims of ineffective assistance of counsel. The Court explained that "[t]he purpose of the structural error doctrine is to ensure

insistence on certain basic, constitutional guarantees that should define the framework of any criminal trial." Id. at 1907. Thus, the "defining feature" of a structural error is one which "'affect[s] the framework within which the trial proceeds,' rather than being 'simply an error in the trial process itself.'" Id. (citing Arizona v. Fulminante, 499 U.S. 279, 310 (1991)). For the same reason, "a structural error 'def[ies] analysis by harmless error standards.'" Id. at 1907–08 (citing Fulminante, 499 U.S. at 309).

The Court discerned three broad rationales for why a particular error is considered structural and not subject to a harmless error analysis. The first is an error which is not designed to protect the defendant from erroneous conviction but rather protects some other interest. Id. at 1908. An example of such an error is a defendant's right to conduct his own defense, which usually increases the likelihood of an unfavorable trial outcome. Id. (citing McKaskle v. Wiggins, 465 U.S. 168, 177 n.8 (1984)). "That right is based on the fundamental legal principle that a defendant must be allowed to make his own choices about the proper way to protect his own liberty." Id. (citing Faretta v. California, 422 U.S. 806, 834 (1975)). "Because harm is irrelevant to the basis of the underlying right, the Court has deemed a violation of that right structural error." Id. (citing United States v. Gonzalez-Lopez, 548 U.S. 140, 149 n.4 (2006)).

The second rationale for an error being deemed structural is if the effects of the error are simply too hard to measure, such as when a defendant is denied the right to select his or her own attorney. Id. (citing Gonzalez-Lopez, 548 U.S. at 149 n.4). The third rationale for deeming an error structural is if the error always results in fundamental unfairness. Such errors include denial of an attorney to an indigent defendant, or failure of a judge to give a reasonable

51

doubt instruction. Id. (citing Gideon v. Wainwright, 372 U.S. 335, 343–45 (1963) and Sullivan v. Louisiana, 508 U.S. 275, 279 (1993)). In that type of case, "it would be futile for the government to try to show harmlessness." Id. Finally, the Court noted that these categories are not rigid and that one or more of the rationales might explain why an error is deemed to be structural. Id. Also, an error can be considered structural even if the error does not lead to fundamental unfairness in every case. Id.

The issue in Weaver was whether the trial court erred when it temporarily closed to the public the voir dire proceedings in the defendant's case. The Court found that the closing of the courtroom was error and deemed it "structural error" because it violated the defendant's constitutional right to a public trial and because of the difficulty of assessing the effect of the error. Id. at 1910. After finding that the trial court had committed structural error, the Court next discussed the proper remedy for addressing the violation of a structural right, noting that "the term 'structural error' carries with it no talismanic significance as a doctrinal matter. It means only that the government is not entitled to deprive the defendant of a new trial by showing that the error was 'harmless beyond a reasonable doubt.'" Id. at 1910 (citing Chapman v. California, 386 U.S. 18, 24 (1967)). In the case of a structural error when there is an objection at trial and the issue is raised on direct appeal, "the defendant generally is entitled to 'automatic reversal' regardless of the error's actual effect on the outcome." Id. (citing Neder v. United States, 527 U.S. 1, 7 (1999)).

However, the Court distinguished the situation where a trial court makes an error and the issue is raised on appeal from the situation where the defendant does not preserve a structural error on direct review but raises it later in the context of an ineffective assistance of

counsel claim. Id. The Court recited the familiar two-prong test from Strickland and noted that the prejudice finding is in most cases a necessary part of an ineffective assistance claim. Id. (citing Strickland, 466 U.S. at 687). This is because while a defendant has a right to effective representation, he or she does not have a right to "mistake free" representation, and as a rule, therefore, a violation of the Sixth Amendment right to representation does not occur in the absence of prejudice. Id. at 1910–11 (citing Gonzalez-Lopez, 548 U.S. at 147; Premo v. Moore, 562 U.S. 115, 128 (2011); Lockhart v. Fretwell, 506 U.S. 364, 370 (1993)).

The issue in Weaver arose via a motion for new trial filed five years after the defendant was convicted but while the direct appeal was still pending, and the state appellate court consolidated the motion for new trial with the direct appeal. Id. at 1906–07. The Court found that while the right to a public trial is structural, it is subject to exceptions, indicating that not every public-trial violation results in fundamental unfairness. Id. at 1909. The Court further found that the failure to object to a public-trial violation does not always deprive the defendant of a reasonable probability of a different outcome. Id. at 1911.

> Thus, when a defendant raises a public-trial violation via an ineffective-assistance-of-counsel claim, Strickland prejudice is not shown automatically. Instead, the burden is on the defendant to show either a reasonable probability of a different outcome in his or her case, or as the Court has assumed for these purposes, . . . to show that the particular public-trial violation was so serious as to render his or her trial fundamentally unfair.[8]

Id.

---

[8] The Weaver Court assumed without deciding that under a proper reading of Strickland, "even if there is no showing of a reasonable probability of a different outcome, relief still must be granted if the convicted person shows that attorney errors rendered the trial fundamentally unfair." 137 S. Ct. at 1911.

The Court continued that the reason for placing the burden on the petitioner derived both from the nature of the error and the difference between a public-trial violation preserved and then raised on direct review, and a violation raised as an ineffective assistance of counsel claim. When a defendant objects at trial to a courtroom closure, the trial court can either order the courtroom opened or explain the reasons for keeping it closed. But when the defendant first raises the closure in an ineffective assistance of counsel claim, the court is deprived of the chance to cure the violation either by opening the courtroom or explaining the reason for the closure. Id. at 1912. Also, when errors are objected to during trial and raised on direct review, the "systemic costs of remedying the error are diminished to some extent." Id. If the court orders a new trial, there is a reasonable chance that "not too much time will have elapsed for witness memories still to be accurate and physical evidence not to be lost." Id. But when an ineffective assistance of counsel claim is raised in post-conviction proceedings, "the costs and uncertainties of a new trial are greater because more time will have elapsed in most cases." Id. In addition, the interest in finality is more at risk, "and direct review often has given at least one opportunity for an appellate review of trial proceedings." Id.

The Court concluded that the differences justify a different standard for evaluating a structural error depending on whether it is raised on direct review or raised instead in a claim alleging ineffective assistance of counsel. Id. The Court further concluded that the defendant in Weaver failed to show deficient performance by counsel because he did not show that there was a reasonable probability that the jury would not have convicted him if his attorney had objected to closure of the courtroom. Id.

Weaver forecloses Carter's argument that the denial of his right to testify was structural error and not subject to a prejudice analysis.[9] Rather, the Court's holding indicates that when a structural error is brought as part of an ineffective assistance of counsel claim, it is subject to the prejudice analysis set forth in Strickland. See also Hartsfield v. Dorethy, 949 F.3d 307, 314 (7th Cir. 2020) (noting distinction between denial of defendant's right to testify by the trial court and claim of ineffective assistance of counsel based on the denial and finding that Strickland prejudice standard applied).

Carter also cites McCoy v. Louisiana, 138 S. Ct. 1500 (2018), for its holding that when an attorney conceded his client's guilt during his opening statement, in contravention of the client's wishes, it was structural error and necessitated a new trial without a prejudice analysis. McCoy, 138 S. Ct. at 1512. However, it was the trial court in McCoy that allowed the attorney to concede the defendant's guilt over the objection of the defendant himself. Id. at 1505. Thus, while the Supreme Court found that the trial court committed structural error that was not subject to review for prejudice, the case was on direct appeal and was not an ineffective assistance of counsel case. In that procedural posture, finding that the concession of guilt was structural error and not subject to a prejudice analysis was consistent with Weaver. See also Rock, 483 U.S. at 62 (finding right to testify is a structural error not subject to harm analysis where trial court denied testimony and defendant objected at trial and raised claim on direct

---

[9] Notably, the dissent in Weaver made the same argument Carter does here, that the Court has recognized that the distinctive attributes of structural errors make them defy analysis by harmless error standards and that the same errors defy an actual-prejudice standard under Strickland. Weaver, 137 S. Ct. at 1916 (Breyer, J., dissenting).

review); Gonzalez-Lopez, 548 U.S. at 146 (trial court committed structural error when it denied defendant counsel of choice and no additional showing of prejudice was necessary).

In Garza v. Idaho, 139 S. Ct. 738 (2019), the Court, in a habeas case, held that an attorney committed structural error that was not subject to a prejudice analysis when he failed to file a notice of appeal when asked to do so by his client. The Court cited Roe v. Flores-Ortega, 528 U.S. 470, 484 (2000), for its holding that when an attorney's deficient performance costs a defendant an appeal that he otherwise would have pursued, prejudice should be presumed with no further showing from the defendant of the merits of his underlying claims. This is because a defendant who instructs counsel to file a notice of appeal on his behalf reasonably relies upon the attorney to file the necessary notice. Garza, 139 S. Ct. at 746 (citing Flores-Ortega, 528 U.S. at 477). "'Counsel's failure to do so cannot be considered a strategic decision; filing a notice of appeal is a purely ministerial task, and the failure to file reflects inattention to the defendant's wishes.'" Id. (quoting Flores-Ortega, 528 U.S. at 477). In addition, there is no disciplined way to accord a presumption of reliability to a judicial proceeding, like an appeal, that never took place. Id. at 747 (citing Flores-Ortega, 528 U.S. at 483; Smith v. Robbins, 528 U.S. 259, 286 (2000)). Although the Court in Garza found, in the context of a habeas claim, that the failure to file a notice of appeal was error necessitating remand without a further finding of prejudice, its holding appears to be limited to the failure to file a notice of appeal and does not apply generally to structural errors.[10]

Based on the foregoing, the court finds that Carter's attorney committed structural error by not telling Carter he had a constitutional right to testify, and not allowing him to

---

[10] Indeed, in neither Garza nor Flores-Ortega did the Court use the term "structural error."

testify despite his clearly expressed wish to do so, because the attorney did not allow Carter to make his own choice about the proper way to protect his own liberty. Weaver, 137 S. Ct. at 1908. Nevertheless, because the error was made by counsel and not the court, and because Carter raises the issue by means of an ineffective assistance of counsel claim in a petition for habeas corpus, the court must further determine whether the error was prejudicial under Strickland.

### b. Establishing Prejudice

As discussed above, to establish prejudice under Strickland, a petitioner must show that there is a reasonable probability that, but for the error, the result of the proceeding would have been different. Strickland, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Id. at 695.

> [T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged. In every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results.

Id. at 696.

Strickland made clear that it is not enough for the defendant to show that the error had a conceivable effect on the outcome of the proceeding because virtually every act or omission of counsel would meet that test. 466 U.S. at 693. Also, "not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." Id.

On the other hand, "a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case." Id. "The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." Id. at 694.

> Accordingly, the appropriate test for prejudice finds its roots in the test for materiality of exculpatory information not disclosed to the defense by the prosecution, United States v. Agurs, 427 U.S.[ 97], at 104, 112–113, 96 S. Ct.[ 2392], at 2397, 2401–2402, and in the test for materiality of testimony made unavailable to the defense by Government deportation of a witness, United States v. Valenzuela–Bernal, [458 U.S. 858, 872–874 (1982)]. The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

Id.

In this case, there is no dispute that Carter wanted to testify and told his attorney that he wanted to testify, but his attorney refused to let him testify without informing him that he had the ultimate choice whether to testify. "[I]f a defendant claims that he would have offered testimony that would be "genuinely exculpatory," courts have held that counsel's failure to inform him of his right to testify may be prejudicial." Michel v. United States, No. 5:06-cr-41-1, 2011 WL 767389, at *5 (W.D. Va. Feb. 25, 2011) (citing Owens v. United States, 483 F.3d 48, 59 (1st Cir. 2007) (abrogated on other grounds by Weaver, 137 S. Ct. 1899) and Palmer v. Hendricks, 592 F.3d 386, 396–99 (3rd Cir. 2010)). Although denial of the right to testify is subject to a prejudice analysis, it is an important right and not to be lightly disregarded. As the Court noted in Rock, "the most important witness for the defense in many criminal cases is the defendant himself." 483 U.S. at 52. And, as the Ninth Circuit noted in Martinez v. Ylst,

951 F.2d 1153, 1157 (9th Cir. 1991), "[a]s a general matter, it is only the most extraordinary of trials in which a denial of the defendant's right to testify can be said to be harmless beyond a reasonable doubt." (citing Luce v. United States, 469 U.S. 38, 42 (1984)). See also Green v. United States, 365 U.S. 301, 304 (1961) (plurality opinion) ("The most persuasive counsel may not be able to speak for a defendant as the defendant might, with halting eloquence, speak for himself.").

Carter asserted both to the state habeas court and to this court that he knew that he had misunderstood the time of day at which Amy died because of his mental health and diabetic condition and was off by several hours in his videotaped statements to the police. He states that he knew the jury would want to hear from him because it was his wife who died and because he waited over an hour to call the police. He also said that he decided with trial counsel to call his twelve-year-old son to testify, and he did not want the jury to think he was hiding behind his son at trial.

More specifically, Carter states that if called to testify, he would have testified to the following: (1) Amy shot herself while he was trying to stop her, and he desperately did not want her to die and was devastated by her death; (2) at the time of Amy's death, he suffered both from extreme anxiety for which he had been prescribed Xanax and also suffered from diabetes; (3) he was likely suffering from ketoacidosis, and it interfered with his ability to think and act clearly; (4) Amy's suicide was so shocking and upsetting to him that he could not even dial a telephone; (5) in his numerous recorded statements to investigators, he wanted to answer every question they had and tried, perhaps too hard, to give the best answers that he could; (6) the fact that he was off by four to five hours regarding the time of death was an example

of how distraught he was and how hard he was trying to help when interviewed by law enforcement officers; (7) he thought Amy died around noon because that was the time he thought he saw on the computer right before Amy shut herself in the bathroom; (8) regarding his hand injury, he was not sure how his hand was cut, but he told the investigators as best he could what he thought had happened based on what he was trying to do, i.e., stop the hammer on the gun from coming down; (9) the combination of extreme anxiety, ketoacidosis, and extreme shock and trauma at the death of his wife made it very difficult for him to function and recall the details of the frantic moments while he was trying to stop Amy from shooting herself; (10) he would have looked the jurors in the eyes and told them he would never have killed Amy and would never have taken away his son's mother. ECF No. 1, at 20–22. Finally, Carter claims that because the evidence in this case was so close, his testimony would have been the tipping point between the murder verdict and a finding of "not guilty" because he would have been able to explain his incorrect statements to the police and the delay in his reporting Amy's death.

The state habeas court heard argument on Carter's claims but did not conduct an evidentiary hearing despite Carter having requested one. See Letter Op., ECF No. 1-2, at 1, 13. The state habeas court found that Carter did not show prejudice by not being allowed to testify because (1) three audiovisual recorded interviews Carter made to law enforcement were shown to the jury and the jury had an opportunity to observe his demeanor; (2) the petitioner entered pleas of not guilty in front of the jury allowing the jury to hear him affirmatively state that he did not kill his wife; (3) statements Carter made to non-law enforcement witnesses were presented to the jury; (4) Carter's statements contained serious discrepancies; (5) the

forensic evidence introduced at trial significantly contradicted much of the content of Carter's statements; (6) the discrepancies in Carter's declarations were so serious that his attorney had to concede the inconsistencies during closing argument; (7) Carter was not qualified to testify about ketoacidosis or the impact it may have had on him and he called other expert witnesses who testified about that issue; (8) the last interview Carter gave to law enforcement happened approximately twenty-one months after his wife's death and contained no indication that he was suffering from a medical condition, but still contained information that was inconsistent with and not supported by forensic evidence; (9) many of the topics about which Carter stated he would testify were addressed either in his interviews or through the testimony of other witnesses and much of his testimony would have repeated other testimony; and (10) he would have put himself in position to be cross-examined and subject to impeachment on numerous points. The court concluded that Carter's cause before the jury was "highly unlikely to be advanced by his repeating at trial either the contents of the statements he had previously given or providing a different version of events." Id. at 12.

This court acknowledges the "doubly deferential" standard of review that requires giving both the state court and the defense attorney any benefit of the doubt when reviewing a claim of ineffective assistance of counsel. Burt v. Titlow, 571 U.S. 12, 15 (2013). Turning to attorney Timothy McAfee's explanation for why he did not call Carter to testify, McAfee stated only that he "thought this was best for the case." McAfee Decl., ECF No. 1-4, at 28 ¶ 6. Carter's co-counsel, Sidney Kolb, offered no further explanation, noting only that McAfee made the decision that Carter was not going to testify without further explanation to Carter or Kolb. Decl. of Sidney Kolb, ECF No. 1-4, at 24 ¶¶ 9–11.

McAfee's lack of explanation stands in contrast to the explanations offered by counsel in other cases. See Matylinski v. Budge, 577 F.3d 1083, 1097 (9th Cir. 2009) (denying ineffective assistance of counsel claim based on denial of right to testify where attorney advised defendant not to testify because cross-examination regarding his prior convictions would have been damaging and any other testimony he gave might have been harmful); Medley v. Runnels, 506 F.3d 857, 860 (9th Cir. 2007) (denying habeas relief where counsel recommended defendant not testify because he would be impeached by prior convictions and statements he made during a lengthy interview with police that someone else committed the murder, which were inconsistent with his intended testimony of self-defense); El-Tabech v. Hopkins, 997 F.2d 386, 390 (8th Cir. 1993) (denying ineffective assistance of counsel claim based in part on counsel's explanation that he had held practice sessions with the defendant and became concerned that jury would not believe him and also was concerned because he "had a tendency to fly into rages on cross-examination[ ]"); United States v. Evertson, No. 4:10-cv-00148-BLW, 4:06-cr-00206-BLW, 2013 WL 828271, at *6 (D. Idaho Mar. 6, 2013) (finding persuasive attorneys' affidavits that they advised defendant not to testify after government showed them impeaching material it intended to use if defendant testified and the material seriously undercut their defense theory); Maksimov v. United States, No. 4:03-CV-615 CEJ, 2006 WL 2802206, at *9 (E.D. Mo. Sept. 25, 2006) (crediting attorney's explanation in affidavit that defendant had made incriminating statements during his proffer meeting which could have been used to impeach his testimony at trial and that attorney was concerned that otherwise inadmissible evidence would be elicited from defendant on cross-examination).

Without an explanation for why his attorneys would not let Carter testify, the court cannot defer to counsel's trial strategy in making the decision. The court recognizes that attorneys routinely advise criminal defendant clients not to testify out of fear that it will have a negative impact. However, in this case, there is no evidence that Carter had previous convictions of which the jury was unaware, that his testimony would open the door for admission of otherwise inadmissible evidence, or that his testimony would undermine the defense theory that Amy committed suicide. To be sure, Carter would have been subject to rigorous cross examination, but McAfee did not offer that as the reason for his decision to not allow Carter to testify. Simply put, the court cannot defer to an explanation of strategy when the explanation is absent from the record.

Turning next to the state habeas court's findings, this court must defer to the finding that Carter did not suffer prejudice unless the court's determination was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d)(1)-(2). To reiterate the deference standard set forth above, in order to be entitled to habeas relief, Carter must show "far more than that the state court's decision was 'merely wrong' or 'even clear error.'" Shinn v. Kayer, 141 S. Ct. 517, 523 (2020) (per curiam) (quoting Virginia v. LeBlanc, 137 S. Ct. 1726, 1728 (2017) (per curiam)). He must show that "the state court's decision is so obviously wrong that its error lies 'beyond any possibility of fairminded disagreement.'" Id. (quoting Harrington v. Richter, 562 U.S. 86, 102 (2011)).

The court notes that a state court determination that ineffective assistance of counsel was not prejudicial to a petitioner is a mixed question of law and fact. Tice v. Johnson, 647 F.3d 87, 106 (4th Cir. 2011) (citing Strickland, 466 U.S. at 698). The court further notes that the prejudice standard in Strickland is the clearly established federal law which governs assessment of Carter's claim. Cullen v. Pinholster, 563 U.S. 170, 189 (2011); Williams v. Taylor, 529 U.S. 362, 405–06 (2000). The court will address the state habeas court's resolution of the mixed questions of law and fact in the context of this deferential standard.

The state habeas court noted that Carter gave three videotaped interviews to law enforcement and that the videos were shown to the jury. The first interview was conducted on April 14, 2011, the day of Amy's death; the second was conducted on May 12, 2011, almost a month after her death; and the third occurred on January 13, 2013, approximately twenty-one months after her death. Carter appeared voluntarily for the interviews and was not represented by counsel. The state habeas court observed that Carter's statements contained "serious discrepancies" and that the discrepancies were so serious that his counsel had to concede the discrepancies during closing argument. Letter Op., ECF No. 1-2, at 12 (citing Trial Tr. vol. 11, 88–89). However, the state habeas court did not describe any of the discrepancies and the cited passage in the closing argument refers only to the discrepancy in the time of death discussed above.

In support of his argument that he should have been allowed to testify, Carter acknowledged that he clearly was off by four to five hours regarding the time of death when he was interviewed by law enforcement. He reported that the death occurred at noon when it happened closer to 5:00 p.m. He argues that had he been allowed to testify, he could have told

the jury that he was distraught and upset and thought Amy died around noon because of what he was watching on the sale of his bulldozer on the computer. When he was giving interviews to law enforcement, he was trying to "put together what happened in his head the best he could and answered every question." ECF No. 1, at 21.

The state habeas court did not address Carter's argument that had he testified he could have explained to the jury the reason for the discrepancy in time. Without doing so, the court's conclusion that the videotaped interviews contained serious discrepancies is at odds with its finding that Carter was not prejudiced by not being allowed to explain the discrepancies. Put another way, after finding the interviews contained discrepancies that were harmful to Carter, it is illogical to conclude that being denied an opportunity to correct the discrepancies was not prejudicial. As the Supreme Court determined in Wiggins v. Smith, 539 U.S. 510, 537 (2003), a case involving an attorney's failure to put on mitigating evidence of a defendant's severely abusive childhood, "[h]ad the jury been able to place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance." In Carter's case, had the jury heard his explanations for why he believed Amy died earlier in the day than she did, there is a reasonable probability that one or more jurors would have credited his explanation and found that his confused state of mind explained the inconsistency. The court finds this conclusion is not subject to reasonable disagreement.

The state habeas court also did not discuss Carter's argument that he could have explained why he believed he cut his hand on the hammer of the gun when he was trying to stop Amy from hurting herself even though forensic investigators did not find his DNA on

the hammer of the gun. Had he testified, Carter could have explained to the jury why he believed he cut his hand on the hammer of the gun while wresting with her over it, and there is a reasonable probability that one or more jurors would have believed him, especially given that one expert testified that Carter could have cut his hand on the rear sight of the gun rather than the hammer. Trial Tr. vol. 9, 270.[11] The fact that Carter was not allowed to testify to these facts in front of the jury undermines confidence in the outcome of his trial, because the jury was left with the impression that Carter lied about how he injured his hand.

The state habeas court also discounted Carter's argument that had he been allowed to testify he could have explained to the jury that the inconsistencies in his testimony were the result of his medical conditions, finding that he was not qualified to testify to a medical diagnosis and that he called medical experts to testify as to his medical diagnosis. While it is true that Carter could not have testified as a medical expert, he could have described to the jury his state of mind immediately after Amy's death and any physical or mental symptoms he experienced. The prosecution emphasized to the jury that Carter did not try to administer any first aid to Amy and did not call the police or an ambulance. Rather, he rode a moped to his parents' house which was a mile away and told his mother that Amy had shot herself. He then waited, without calling the police, for his mother to take his son to baseball practice.

Carter asserts that he should have been allowed to explain to the jury why he had waited over an hour to call the police. The court agrees. The evidence that Carter waited to call the police was puzzling at best and damning at worst. The fact that Carter was not allowed to

---

[11] In addition, the DNA expert testified that Carter's blood was found on the grip of the gun. Trial Tr. vol 6, 148–52, 158–60. The fact that the only bleeding injury sustained by Carter was on the webbing of his left hand supports his claim that he was cut during the struggle over the gun, even if not on the hammer.

explain to the jury why he made the choices he did in the hour after Amy's death undermines confidence in the outcome of the trial. The jury was left with the impression that Carter fled the scene with no explanation at trial as to why he did so. Based on the evidence presented at trial, it was unreasonable for the state habeas court to conclude that Carter's lack of opportunity to testify about why he did not call the police from his house was not prejudicial.

The state habeas court also pointed out that in the third interview, there is no indication that Carter was ill or otherwise incapacitated, but he "continued to give information that was not consistent with and not supported by the forensic evidence." Letter Op., ECF No. 1-2, at 12. However, the state habeas court did not cite the forensic evidence to which it was referring. Without doing so, this court cannot find that the state court determination is reasonable in light of the evidence presented to the state court. In addition, this court has reviewed the record and notes that some of the forensic evidence supports Carter's theory that Amy shot herself. For example, the blood spatter expert testified that the position of Amy's hand in photographs taken after the scene could be consistent with her having discharged the gun. Trial Tr. vol. 6, 238, 253. The expert further testified that the absence of blood on Amy's right palm was consistent with her having had her hand on the pistol grip when it was discharged. Id. at 244–45. Nor was there any indication that Carter had his hand on top of Amy's right hand when the gun was discharged or that he placed her index finger inside the trigger guard after the gun was discharged. Id. at 238, 241.

To be sure, other forensic evidence contradicted Carter's description of events, such as the lack of his DNA in the hammer mechanism of the gun, which he told investigators was the cause of injury to his left hand, or Carter's continued confusion over the time of the auction

and Amy's death. But the state habeas court's finding that Carter was not prejudiced when he was not allowed to testify because the forensic evidence was inconsistent with statements he gave investigators is not entitled to the high level of deference contemplated by 28 U.S.C. § 2254(d)(1)-(2), because it is based on an incomplete assessment of the evidence introduced at trial. To clarify, this court is not conducting a de novo review of the evidence because it is not entitled to do so. Harrington, 562 U.S. at 101–02. Rather, this court finds that the state habeas court's determination is not entitled to deference under AEDPA because it did not cite the forensic evidence to which it referred. The court cannot defer to a state court finding based on the forensic evidence when the evidence is not identified.

Another reason that the state habeas court gave for not finding prejudice was that Carter entered pleas of "not guilty" before the jury and that the jurors therefore heard him affirmatively state that he did not kill his wife. Letter Op., ECF No. 1-2, at 12. Carter's "not guilty" pleas consisted of a total of six words spoken in the first moments of a twelve-day jury trial. Trial Tr. vol. 2, 6–7. The court finds that Carter's brief recitation of "not guilty" is no substitute for the testimony that he wanted to provide the jury—his description of how Amy died, an explanation of his behavior immediately after her death, that he loved his wife and was devastated by her loss, and that he would not have taken his son's mother from him. The state habeas court's reliance on Carter's guilty plea to find that he was not prejudiced by not being allowed to testify is unreasonable given the Supreme Court's repeated admonitions that a criminal defendant has a constitutional right to testify on his own behalf and that he may be the best person to testify on his behalf. See also United States v. Lore, 26 F. Supp. 2d 729, 739–40 (D.N.J. 1998) (finding that defendant's testimony could have explained inculpatory

evidence or at least contradicted the testimony of another witness and detective and stating, "[i]t is not for the court to decide whom the jury would believe when faced with the contradiction").

The state habeas court also found that Carter was not prejudiced by his attorney's decision to prevent him from testifying because much of what he would have testified to was addressed either in his interviews with investigators or through the testimony of other witnesses and much of his proposed testimony would have been a repeat of other evidence. Letter Op., ECF No. 1-2, at 12. The court did not specify what evidence would have been repetitive or how the repetitiveness would have detracted from its believability. But more importantly, the Supreme Court has made clear that such testimony by other witnesses is not a substitute for a defendant testifying on his own behalf. See Rock, 483 U.S. at 52 ("[T]he most important witness for the defense in many criminal cases is the defendant himself."); McGautha v. California, 402 U.S. 183, 217 (1971), reh'g granted, judgment vacated sub nom. Crampton v. Ohio, 408 U.S. 941 (1972) ("[T]he testimony of an accused denying the case against him has considerably more force than counsel's argument that the prosecution's case has not been proved.")

In Casiano-Jimenez v. United States, 817 F.3d 816 (1st Cir. 2016), the court found that a petitioner was prejudiced when his attorney refused to allow him to testify even though the defense called an expert to testify on the petitioner's behalf, because the testimony the petitioner was not allowed to give would not have been the same as the expert's testimony but would have been materially different and more exculpatory. "The bottom line is that a third party's testimony as to what a defendant may have known cannot fairly be equated with the

defendant's own first-hand account of what he actually knew." Id. at 822. The same is true in this case. While the testimony of the experts and other witnesses provided pieces of the puzzle that the jury needed to understand this case, their testimony is not a substitute for Carter's explanation of what happened in the moment Amy died, or for his behavior afterward. Coupled with the fact that the state habeas court did not explain what testimony would have been repetitive, the court cannot defer to the state court's finding on this point.

The evidence in this murder trial was entirely circumstantial. Forensic evidence both supported and detracted from Carter's version of events. Witnesses testified that Carter and Amy had a troubled marriage and that she had stolen money from his business and repeatedly wrecked a luxury car while under the influence of drugs, which supports the idea that Carter was tired of her behavior and murdered her. Other witnesses testified that Amy was depressed and anxious in the days before her death, had reported rape by an acquaintance, and had made suicidal gestures with the same gun that was used in her death, which supports the defense's theory that she took her own life. If Carter attempted to force open the bathroom door, it could have been because he wanted to kill her, or it could have been because he wanted to save her. The same is true of a scenario in which Amy and Carter struggled over the gun. Carter's behavior in the hours after Amy's death, whether he was suffering from ketoacidosis or was high on Xanax, could be construed as that of someone who murdered his wife, or as that of someone who witnessed his wife shoot herself after he struggled to keep her from doing so. In this regard, it is worth noting that when the Virginia Court of Appeals considered the issue of the sufficiency of the evidence on direct appeal, it mentioned that "[i]n this case, Carter did not testify," and relied for sufficiency of the evidence purposes on the statements

70

Carter previously had made to investigators. Carter v. Commonwealth, No. 0048-16-3, ECF No. 1-4, at 6.

Carter is the only living person who knows what happened on the day Amy died and made an unambiguous request to tell his side of the story to the jury. Given the closeness of the evidence and the requirement of a unanimous jury verdict for a conviction,[12] there is a reasonable probability that had he been allowed to testify, the outcome of the trial would have been different. At a minimum, there is a reasonable probability that his testimony would have convinced the jury to find him guilty of one of the lesser included offenses of voluntary manslaughter or involuntary manslaughter, both of which carry significantly shorter sentencing ranges.[13] In Nichols v. Butler, 953 F.2d 1550, 1554 (11th Cir. 1992), the petitioner was convicted of robbery partly on the testimony of one witness who had glimpsed him only briefly. The court concluded that the petitioner showed prejudice under Strickland when his attorney would not let him testify because the case was very close and if he had testified, he could have presented his version of events in his own words and the jury could have weighed his credibility against that of the witness. In this case, if Carter had testified, the jury could have weighed his credibility against that of the other witnesses and evaluated his testimony in light of the other evidence presented. The fact that he was not allowed to testify undermines confidence in the outcome of his trial.

---

[12] "Article 1, section 8 of the Constitution of Virginia guarantees to a criminal defendant tried by jury 'a speedy and public trial, by an impartial jury of his vicinage, without whose unanimous consent he cannot be found guilty.'" Carver v. Commonwealth, 17 Va. App. 7, 434 S.E.2d 916 (Va. Ct. App. 1993); Va. Sup. Ct. Rule 3A:17(a).

[13] Second degree murder is punishable by confinement in a state correctional facility for five to forty years. Va. Code § 18.2-32. Both voluntary manslaughter and involuntary manslaughter are Class 5 felonies, punishable by a term of imprisonment of from one to five years. Va. Code §§ 18.2-35, 18.2-36, 18.2-10.

Based on the foregoing, the court finds that the state habeas court's conclusion that Carter was not prejudiced when he was not allowed to testify is contrary to the Supreme Court's opinion in Strickland that set forth the standard of evaluating prejudice in an ineffective assistance of counsel claim. The court finds that there is a reasonable probability that, but for the error of not allowing him to testify, the jury would have had a reasonable doubt that Carter was guilty of second-degree murder and the result of the proceeding would have been different. Strickland, 466 U.S. at 694–95.

### III.

By preventing Carter from testifying, trial counsel's performance was deficient, as determined by the state habeas court. The prejudice resulting from this deficiency is that the jury did not get to hear Carter's description of events as the only person present when Amy died or hear his explanation for inconsistencies in the testimony he gave at three police interviews where he appeared without counsel. The state habeas court's determination that Carter was not prejudiced by counsel's deficiency is unreasonable under the Strickland standard. Therefore, the court will grant Carter's petition for habeas corpus relief on Claim Three. Unless the Commonwealth of Virginia retries Carter for murder and use of a firearm in the commission of murder within 120 days, he shall be released.

For the reasons discussed herein, the state habeas court's decisions on the remaining claims in Carter's petition are based on a reasonable determination of the facts and a reasonable application of federal law. Because the court cannot grant relief on those claims, the court will grant respondent's motion to dismiss Claims One and Two.

On Claim One, the court concludes that Carter has failed to make a substantial showing of the denial of a constitutional right as required by 28 U.S.C. § 2253(c)(1) and will deny a certificate of appealability. The court grants a certificate of appealability as to Claim Two.

**ENTERED:** This 31st day of March 2023.

Michael F. Urbanski
Chief United States District Judge